Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI**
**AT INDEPENDENCE**

| | |
|---|---|
| ISOSCELES PROPERTIES, LLC<br>1308 NE Windsor Drive<br>Lee's Summit, MO 64086<br><br>   Plaintiff,<br><br>vs.<br><br>CITY OF INDEPENDENCE, MISSOURI<br>111 E. Maple<br>Independence, MO 64050<br>(Serve: Mayor Eileen Weir<br>City Hall<br>111 E. Maple<br>Independence, MO 64050)<br><br>   Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No.: _____<br>)<br>)  Division:_____<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PETITION FOR DECLARATORY JUDGMENT (EA), TEMPORARY REGULATORY TAKING WITHOUT JUST COMPENSATION (X1), VIOLATION OF EQUAL PROTECTION UNDER THE MISSOURI CONSTITUTION ARTICLE I, SECTION 2 AND THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION (X1), VIOLATION OF CIVIL RIGHTS (42 U.S.C. SECTION 1983) (X1) AND INVERSE CONDEMNATION (RC or X1)**

COMES NOW, Plaintiff Isosceles Properties, LLC (hereinafter "Plaintiff" "property owner" or "Isosceles Properties") and for its cause(s) of action against the Defendant City of Independence, Missouri states and alleges as follows:

**ALLEGATIONS APPLICABLE TO ALL COUNTS**

**THE PARTIES**

1.  Isosceles Properties is a limited liability company organized and existing under the laws of the State of Missouri.

1

EXHIBIT
**A**

2.     Isosceles Properties is entitled to all rights, privileges, immunities, and protections granted

       and guaranteed by the laws of the State of Missouri, the Missouri Constitution, the laws of

       the United States of America, and the Constitution of the United States of America.

3.     Defendant City of Independence, Missouri ("City") is a corporation, duly organized and

       existing by virtue of Missouri law and may be served at the aforementioned address.

4.     The City is a person and at all times relevant hereto acted under color of the statutes, laws,

       constitution, customs, ordinances, and usage of the State of Missouri.

5.     The City, in its actions alleged herein, deprived Plaintiffs of their rights, privileges,

       immunities, and protections secured by the laws of the State of Missouri, the Missouri

       Constitution, the laws of the United States of America, and the Constitution of the United

       States of America.

## JURISDICTION AND VENUE

6.     Jurisdiction and venue are proper in the Jackson County Circuit Court pursuant to Sections

       478.070, 478.220 and 508.050 RSMo.  Defendants may be served as set forth above.

## THE PROPERTY

7.     Isosceles Properties owns the property commonly known as 3206 N. Spring Street,

       Independence, Missouri (the "subject property").

8.     The subject property is legally described as Lot 1, SOLID ROCK ADDITION, a

       subdivision in Independence, Jackson County, Missouri.

9.     The City approved the final plat of SOLID ROCK ADDITION on April 7, 2003 by

       Ordinance 15380.

2

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

10. A copy of SOLID ROCK ADDITION, Lots 1, 2 and 3, a Replat of Lot 97, KENTUCKY HILLS, a subdivision in Independence, Jackson County, Missouri is attached hereto as Exhibit 1 and is incorporated herein.

11. Lot 97 had been a part of the Kentucky Hills subdivision but the City approved a replat of Lot 97 that created a new subdivision consisting of three new lots carved out of Kentucky Hills that was separate and apart from the plat of Kentucky Hills.

12. A copy of the Corporation Warranty Deed conveying the subject property in 2017 to Isosceles Properties is attached hereto as Exhibit 2 and is incorporated herein.

13. The subject property is located between Pleasant Street on the west and N. Spring Street on the east and is on the north side of Colonel Avenue in Independence, Missouri.

14. The subject property is approximately 2.535 acres in size.

15. The subject property is an underutilized tract.

16. There is a vacant structure on the subject property that has not been occupied for several years and an asphalt parking area. The rest of the subject property is vacant.

17. The subject property is zoned R30/PUD.

18. According to Section 14-300-01-A of the City's Unified Development Ordinance ("UDO") the District Name for the Map Symbol R30/PUD is High Density Residential PUD.

19. The City rezoned the subject property to a high density residential PUD district.

20. According to Section 14-200-01-A of the UDO, the UDO classifies land uses into five major groupings: residential, public and civic, commercial, industrial and other. These are referred to as use groups in the UDO.

21. According to Section 14-200-01-B of the UDO each use group is further divided into more

3

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

specific use categories. Use categories classify land uses and activities based on common functional, product, or physical characteristics.

22. According to Section 14-200-02 of the UDO, the residential use group includes uses that provide living accommodations to one or more persons. The group includes two use categories: group living and household living.

23. According to Section 14-200-03, household living category, residential occupancy of a dwelling unit is by a family with tenancy arranged on a monthly or longer basis.

24. According to Section 14-200-03-A a detached house is defined as a building containing one dwelling unit located on a single lot with private yards on all sides.

25. According to Section 14-200-03-D a two-unit house is a building containing two dwelling units, both of which are located on a single lot or parcel (also referred to as a duplex or two-flat). The dwelling units are attached and may be located on separate floors or side by side.

26. According to Section 14-300-01-B of the UDO "The R district names and map symbols are intended to provide a general indication of what is allowed in the district, with the "R" denoting the residential orientation of the district and the numeral providing a general indication of he maximum allowable density, expressed in terms of the approximate number of dwelling units allowed per acre of land area."

27. According to the UDO, because the subject property is zoned R30/PUD and is approximately 2.535 acres in size, the maximum allowable density, expressed in terms of the approximate number of dwelling units per acre of land, for the subject property would be approximately 76 units (i.e. 2.535 acres x 30 units to the acre = 76.05 units).

4

28.   According to Section 14-300-03-A of the UDO, uses are allowed in the R zoning districts
      in accordance with Table 300-1 in the UDO.

29.   According to Section 14-300-03-C of the UDO, uses identified with a "P" in Table 300-1
      are permitted as-of-right in the subject zoning district, subject to compliance with all other
      applicable standards of the UDO.

30.   According to Section 14-300-03-F of the UDO, uses not listed and those identified with a
      "-" are expressly prohibited.

31.   According to Section 14-300-03-G of the UDO, the "use standards" column of Table 300-
      1 identifies use-specific standards that apply to some uses.

32.   According to Table 300-1 of the UDO a two-unit house (also known as a duplex or two-
      flat) is the only household living use that is identified as "P" Permitted in the R30/PUD
      zoning district.

33.   According to Table 300-1 of the UDO a detached house is not allowed in the R30/PUD
      zoning district.

34.   According to Table 300-1, a two-unit house is the only residential household living use
      that is either a permitted use or a conditional use that is not subject to any additional "use
      standards".

35.   According to Section 14-300-04 of the UDO, different development options are offered in
      the R districts as a way of promoting a wide variety of housing options and lifestyle
      choices.

36.   According to Section 14-300-04-D the planned unit development (PUD) designation is
      required for all R-18 and R-30 Districts.

5

37. The PUD designation was required for the subject property.

38. Table 300-2 of the UDO identifies the basic lot and building standards for all developments in the R districts.

39. According to Table 300-2 of the UDO, under a Conventional Development, the minimum lot area in the R30/PUD district is 3,500 square feet (with a notation that the minimum lot area per unit for elderly housing developments in the R30 districts is 800 square feet); the minimum lot area per unit is 1,450 square feet; and the minimum lot frontage is 30 feet.

40. According to Section 14-300-06 of the UDO, uses and development in the R districts are subject to other standards including the following: 14-300-06-A Parking, Loading and Vehicle/Equipment Storage; 14-300-06-B Landscaping and Screening; 14-300-06-D Signs; 14-300-06-D Accessory Uses and Structures (Including Fences); 14-300-06-E Flag Lots; 14-300-06-F Sidewalks; 14-300-06-G Building Separation.

41. Section 14-300-06 of the UDO does not specifically list Section 14-505-06 as a section that uses and development in the R districts are subject to.

42. The City zoned the subject property district R30/PUD before Isosceles Properties purchased the subject property in March 2017.

43. The subject property was zoned district R30/PUD at the time the subject property was conveyed to plaintiff.

44. The zoning of the property adjoining on the north of the subject property is R30/PUD.

45. The zoning of the property to the west, south and east of the subject property is R-6.



Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

**THE APPLICATIONS**

46.    In the summer of 2020, Isosceles Properties submitted an application to the City seeking approval of a preliminary development plan for a 22-unit duplex development on the subject property (the "duplex development" or "duplex application").

47.    Isosceles Properties intended to market the duplex development to persons 65 and older and Isosceles Properties anticipated that the duplex development could provide housing to elderly persons.

48.    In June 2020, prior to the filing of the duplex application, Isosceles Properties had a pre-application video conference with city staff to discuss the duplex development.

49.    During the pre-application videoconference Isosceles Properties specifically asked city staff to identify the UDO provisions/criteria against which the duplex application would be measured.

50.    In response to that inquiry, city staff identified only Section 14-703-05-H of the UDO.

51.    During the pre-application videoconference the City staff did not tell Isosceles Properties that the provisions of Section 14-505 applied to the duplex application or that it would allege that section to be applicable to the duplex development.

52.    During the June 2020 pre-application videoconference call with the city staff, Isosceles Properties went through the criteria of Section 14-703-05-H of the UDO with the city staff and city staff did not identify any specific review criteria to plaintiff not met by the duplex application.

53.    When Isosceles Properties filed the duplex application with the City it was identified as Case 20-810-02.

7

54. At the time of the filing of the duplex application the subject property was already zoned district R30/PUD.

55. At the time of the filing of duplex application, the City had already designated the subject property as PUD.

56. Under the duplex application, the existing structure on the subject property would be removed, the site cleared and replaced with 11, single story, two-bedroom duplexes.

57. The duplexes shown on the duplex application were a permitted use under the R30/PUD zoning of the subject property.

58. In the duplex application, driveways for the units were oriented towards Pleasant and Spring streets.

59. Driveways for the existing structures on Pleasant and Spring streets have driveways oriented toward Pleasant and Spring streets.

60. The south tract on the duplex development, along the north side of Colonel Drive, was the site of the proposed drainage basin for stormwater runoff.

61. The detention basin proposed on the south tract would address existing storm water drainage issues and the new impervious surfaces created by the proposed development.

62. Attached hereto as Exhibit 3 is a copy of the plans for the duplex development and is incorporated herein.

63. The proposed single-story duplexes generally met the residential design requirements of the UDO.

64. The facades of the structures also met the requirements for materials and architectural articulation.

8

65.   Isosceles Properties provided five different variations of siding and colors when the City's
      staff asked for architectural variation to create additional appeal.

66.   The duplex application met the City's off-street parking requirements.

67.   The duplex development proposed a use of the subject property that was permitted as of
      right in the R30/PUD district.

68.   The duplex development proposed a density of 22 units on the 2.535 acre subject property
      which is less than one-third of the density allowed by the R30/PUD district.

69.   The duplex development met all the lot and building standards identified in Table 300-2 of
      the UDO for the R30/PUD district.

70.   In filing the duplex application, Isosceles Properties desired and expected to develop the
      subject property and produce income for it and a projected profit and increase its property
      values and generally take an underutilized parcel and make it productive by developing the
      subject property with a use that was permitted under the existing zoning on the subject
      property.

71.   In addition, upon information and belief, the subject property is in a federally designated
      opportunity zone which opportunity zone designation encourages development of
      properties in opportunity zones and provides benefits for development of properties in
      opportunity zones.

72.   Isosceles Properties desired to develop the subject property and take advantage of the
      benefits provided for developing property in federally designated opportunity zones.

73.   The duplex application was not the first application that Isosceles Properties had filed with
      respect to the subject property seeking to develop the subject property after it acquired title

9

to the subject property in 2017.

74. On January 8, 2019 Isosceles Properties sought approval from the City for a preliminary development plan for a 38-unit development on the subject property (the "prior application").

75. The prior application by Isosceles Properties proposed a duplex, a fourplex, four six-plex's and an eight-plex. The prior application would have been a development of 7 structures on individual lots. Some of those structures on the prior application would have been more than one- story tall.

76. Residents of the adjoining Kentucky Hills subdivision opposed the prior application at the Planning Commission hearing in January 2019.

77. The Planning Commission hearing on the prior application was marred by negative sounds made by the opponents to points made by Isosceles Properties in favor of the prior application and by cheering and applause to comments made in opposition by residents who spoke in opposition at that hearing thereby creating a hostile atmosphere and an atmosphere intended to intimidate the members of the Planning Commission to oppose the prior application.

78. Upon information and belief, the only persons who spoke in opposition to the prior application were residents of the Kentucky Hills subdivision.

79. Residents of the Kentucky Hills subdivision do not constitute the "public as a whole" of the City.

80. The City's Planning Commission recommended denial of the prior application.

81. Isosceles Properties withdrew the prior application on January 22, 2019 before it was

10

considered by the City Council.

82.    The subsequent duplex application by Isosceles Properties contains several substantial changes from the prior application to try and address comments made by opponents to the prior application.

83.    Under the prior application, the proposed number of units was 38.

84.    Under the duplex application the proposed number of units was 22.

85.    The duplex application proposed about 40% less units as compared to the prior application.

86.    Under the prior application, while still substantially less than the allowed 30 units per acres, the proposed density was nearly 15 units per acre.

87.    Under the duplex application, while still substantially less than the allowable 30 units per acre, the proposed density was just about 8.67 units per acre.

88.    As compared to the prior application, Isosceles Properties cut the number of units by over 40% and cut the density by nearly half.

89.    In addition, under the duplex application, Isosceles Properties eliminated the four-plex, all the six-plex's and the eight-plex and made all the units duplex units and made all the units single story.

90.    There is adequate gas service to serve the duplex development.

91.    There is adequate electric service to serve the duplex development.

92.    There is adequate sewer service to serve the duplex development.

93.    There is adequate water service to serve the duplex development.

94.    The City's police and fire departments can provide adequate police and fire protection to the subject property.

11

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

95. Regarding traffic, Isosceles Properties had a traffic consultant, Merge Midwest Engineering, review the duplex application and the traffic engineering firm concluded minimal traffic impact from the duplex application.

96. The Merge Midwest Engineering traffic analysis indicated only 20 vehicles per hour during the AM peak and 25 vehicles per hour during the PM peak hour would be generated by the duplex development.

Attached hereto as Exhibit 4 is a copy of the traffic engineer's letter and is incorporated herein.

97. The duplex application would not adversely affect the public's health, safety and welfare because adequate public services can be provided.

98. By letter dated August 4, 2020, after the filing of the duplex application and prior to the hearing on the duplex application before the Planning Commission, the City's staff sent a letter to the architect for the duplex application with the staff's comments on the duplex application and by letter dated August 15, 2020 the architect responded to that City staff letter.

99. In its letter to the architect, the city staff suggested an amenity like a gazebo be added and Isosceles Properties added a gazebo to its plans.

100. On August 25, 2020 the duplex application went before the City's Planning Commission.

101. Prior to the Planning Commission hearing on August 25, 2020, Isosceles Properties submitted to the City a rough draft of the covenants for the duplex development.

102. At the Planning Commission hearing, the City staff recommended denial of the duplex application.

12

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

103. The reasons alleged by the City's staff for recommending denial of the duplex application were as follows: "(1) The residential infill development standards of Section 14-505-06, intended to encourage infill development that is compatible with the physical character of the neighborhood in which the property is located, would not be met. (2) The orientation of the duplex driveways will create a traffic flow and parking problem along N. Pleasant Street and N. Spring Street. (3) The old storm and sanitary sewer systems in place in the area are operating near their limits. (4) The applicant has not provided a rough draft of covenants or indication of other provisions for the maintenance of the common tract, including its drainage basin and amenities. (5) The amenity provided (a gazebo) is not adequate."

104. The alleged reasons for recommending denial of the duplex application by city staff were not credible and were without merit.

105. Prior to the August 25, 2020 Planning Commission hearing, Isosceles Properties submitted a rough draft of covenants regarding the maintenance of the common tract.

106. The city staff received the rough draft of covenants from Plaintiff and Plaintiff submitted a copy of the same to the Planning Commission during the August 25, 2020 hearing.

107. Nevertheless, at the Planning Commission meeting the city staff alleged the lack of a rough draft of covenants as a reason for recommending denial.

108. In addition, notwithstanding the fact that it was city staff who suggested the idea of adding a gazebo to the duplex development plans, and notwithstanding the fact that Isosceles Properties did add a gazebo to the plans as suggested by staff, one of the reasons staff alleged it was recommending denial was because a gazebo was not adequate.

13

109.    Notwithstanding the fact that city staff admitted that the duplex application met the city's

off-street parking requirements and was in receipt of an unrebutted traffic engineer's report

from Isosceles Properties essentially stating the traffic impact from the duplex development

would be minimal, the city staff speculated and alleged there would traffic flow and parking

problems on the adjoining streets.

110.    The city staff's allegation of traffic flow and parking problems was not based on any

scientific traffic analysis but instead was based on speculation and conjecture.

111.    The city staff alleged that storm and sanitary systems in the area were operating near their

limits but failed to state or acknowledge that the Public Works department had issued an

email in connection with the prior application stating that the change to dry weather peak

flow for the 32 units would be within the pump station's operating range.

112.    If the dry weather peak flow for 32 units on the subject property would be within the pump

station's operating range, the 22 units in the duplex development would be within the pump

station's operating range as well.

113.    While Table 300-1 of the UDO identifies Section 14-505 as a "use standard" for all

conditionally permitted household living uses, Table 300-1 does not identify Section 14-

505 of the UDO as a "use standard" to be met by a two unit house development.

114.    Notwithstanding that city staff did not identify Section 14-505 of the UDO to Isosceles

Properties as a criteria applicable to the duplex application during the pre-application

videoconference, and notwithstanding that Table 300-1 does not identify 14-505 as a use

standard applicable to a two unit house development, and notwithstanding that Section 14-

300-06 of the UDO does not specifically identify Section 14-505 as a section applying to

14

development in the R districts, city staff alleged as a reason of denial of the duplex development that Section 14-505-06 would not be met.

115. Section 14-505-06-B provides, in pertinent part "Unless otherwise noted in this code, this provision shall apply to lots platted or otherwise created before January 1, 1975."

116. The lot that is the subject property was platted after January 1, 1975.

117. The duplex development met the requirements of Section 14-505-06-C through Section 14-505-06-K.

118. At no time during the Planning Commission hearing or during the City Council's consideration of the duplex application did the City's staff ever identify a specific provision in Section 14-505-06-C through Section 14-505-06-K that would not be met by the duplex application.

119. The imposition of criteria on the duplex application that was not applicable to the duplex application was unreasonable.

120. Even if applicable, the city staff's allegation that 14-505-06 of the UDO would not be met by the duplex application was wrong as the duplex application did meet those requirements.

121. Isosceles Properties presented competent and substantial evidence that the duplex application was reasonable and should be approved.

122. Among other things Isosceles Properties provided competent and substantial evidence to the Planning Commission that duplexes were a permitted use in the R30/PUD district and that proposed density was less than a third of what was allowed by the R30/PUD district and the number of units was nearly 40% less than that proposed by the prior application and that the subject property was suitable for duplex uses and that the duplex application

15

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

met the lot and building standards of the R30/PUD district and that the reasons given by the City's staff for denial were not credible.

123. At the Planning Commission hearing Isosceles Properties presented competent and substantial evidence that the duplex application would be in keeping with the character of the neighborhood and the uses of nearby property.

124. At the Planning Commission hearing Isosceles Properties presented competent and substantial evidence that the duplex application would not negatively affect nearby property.

125. At the Planning Commission hearing Isosceles Properties presented competent and substantial evidence that there would no relative gain to the public's health, safety and welfare by denying the duplex application.

126. At the Planning Commission hearing Isosceles Properties presented competent and substantial evidence that denial of the duplex application would result in hardship to plaintiff and that hardship outweighed any gain to the public in denying the duplex application.

127. At the Planning Commission hearing there was substantial evidence from Isosceles Properties that there were adequate public utilities and other needed public services that could serve the subject property regarding the duplex application.

128. At the Planning Commission hearing Isosceles Properties presented competent and substantial evidence that the duplex application would accomplish goals and objectives from the City's Comprehensive Plan.

129. Residents of Kentucky Hills subdivision opposed the duplex application at the Planning

16

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

Commission hearing on the duplex application.

130. Upon information and belief the only persons who spoke in opposition to the duplex application were persons from the Kentucky Hills subdivision.

131. Residents of the Kentucky Hills subdivision do not constitute the "public as a whole" of the City.

132. Opposition by the Kentucky Hills residents to the duplex application was not based on zoning (because the duplex project is a permitted use in the existing R30/PUD zoning district), or density (because the duplex development is at a density that is less than 1/3 of the allowable density) or other objective criteria but merely upon a desire to have a play place they don't own while Isosceles Properties pays the taxes on the subject property and pays to mow the grass on the subject property, to wit:

Re: Jana Evans email to Planning Commission dated August 12, 2020:

"The Kentucky Hills Home Owner's Association was formed 18 months ago for the purpose of stopping development on our former Country Club Lot 97."

. . .

"We intend to retain the right we have enjoyed for over 60 years to use that land to play on as families, hold birthday parties upon and for our children to have a safe, visible and well supervised place to hang out and play ball that is within walking distance from home, and well centered so each and every neighborhood child can meet their friends from school and spend quality time together."

. . .

"There is no good plan for any other use of this property other than its intended use. And we will never stop saying no."

Re: Isobel Ross email to Planning Commission dated August 7, 2020:

"Keeping it the much needed green space is desired by myself and many others that reside here. Options and ideas are being thought of for improving the space, I personally wish the parks department would help in grant funding and possibilities on community gardening and natural land space that would benefit children attending the local elementary school."

Re: Duane Steiner email to the Planning Commission dated August 13, 2020:

17

"This location should remain a green space and should become the City's newest Park – let's name it 'Kentucky Hills Green'"

Re: Mary Wilcox letter:

"Kentucky Hills residents want that 2.5 acres to remain greenspace & park-like for the enjoyment of all residents as has been the case for many years."

133. The Planning Commission voted to continue the hearing and at a subsequent hearing voted to recommend denial of the duplex application.

134. The Planning Commission recommendation of denial was not based on a substantial relationship to a legitimate public purpose or applicable or appropriate criteria but instead was based on a desire to appease a vocal group of neighborhood opponents.

135. On November 2, 2020 and November 16, 2020 the duplex application, now the subject of Ordinance 20-076, came before the City Council for essentially 1st and 2nd reading respectively.

136. On November 2, 2020 and November 16, 2020, a representative of Isosceles Properties spoke in favor of the duplex application, Ordinance 20-076 and made many of the above points in favor including, but not limited to, that the subject property was not part of the Kentucky Hills subdivision, that the duplex project was a permitted use, that a detached house like the ones opponents have is not a permitted use in the R30/PUD district according to Table 300-1 of the UDO and that the proposed density was less than 1/3 of that allowed by the existing zoning.

137. On November 2, 2020 and November 16, 2020 residents of Kentucky Hills spoke on opposition to the duplex application.

138. In particular, at the November 16, 2020 City Council meeting opponent residents of the

18

Kentucky Hills neighborhood brought signs and the meeting was marred by cheering and applause to comments made in opposition by residents who spoke in opposition which created an atmosphere intended to intimidate the City Council into voting no on the duplex application, Ordinance 20-076.

139. Upon information and belief, the only persons who spoke in opposition at either of the City Council meetings on the duplex application were residents from the Kentucky Hills subdivision.

140. Residents of the Kentucky Hills subdivision do not constitute the "public as a whole" of the City.

141. In addition, at the November 16, 2020 City Council meeting on the duplex application, city staff wrongly informed the City Council that a legal protest had been filed relative the duplex application and that a supermajority vote by the City Council in favor of the duplex application would be required to approve the duplex application.

142. A legal protest was not applicable to the duplex application as the subject property already carried the PUD designation and was required to be designated PUD by the UDO.

143. On November 16, 2020 the City Council voted to deny the duplex application, Ordinance 20-076.

144. Section 14-703-05-H of the UDO sets forth the review criteria for decisions on proposed preliminary development plans.

145. The duplex application met and satisfied the review criteria in 14-703-05-H of the UDO.

146. Among other reasons, the duplex application met and satisfied the review criteria in 14-703-05-H of the UDO as follows:

19

1.     The consistency with the Comprehensive Plan.

The duplex application is consistent with the Comprehensive Plan. Imagine Independence Comprehensive Plan 2040 was adopted in 2018. The duplex application is consistent with a number of the provisions contained therein including, but not limited to the following:

-According to the Neighborhoods and Housing section the city's vision is to "**create vibrant, safe neighborhoods that** are walkable and **offer diverse** uses, and **housing options for all.**" (emphasis added). The duplex application furthers that vision by creating diverse housing options for all.

-One of the "Guiding Principles" in this section is "**Provide a diversity of housing options in all neighborhoods.**"(emphasis added). The duplex application is consistent with this Guiding Principle in that it would provide a diversity of housing options in the subject neighborhood.

-The City wants to "**Promote a mix of housing types *within* each neighborhood** to provide options for households of all types (singles, families, retirees, etc.) and people of all incomes and ages." P. 26. (emphasis added) Approval of the duplex application would further that goal because it would promote a mix of housing types in the subject neighborhood. And it would provide options for households of all types.

-The City wants to "Concentrate new development in areas contiguous to existing neighborhoods where it is most **cost effective to extend infrastructure and services.**" P. 26. (emphasis added) Approval of the duplex application will further that goal.

-One of the Guiding Principles of the City's Land Use policy in the Comprehensive Plan is to "Protect and enhance the viability, livability and affordability of the City's residential neighborhoods while **integrating multifamily developments throughout the community.**" P. 33. (emphasis added) Approval of the duplex application would be consistent with this Guiding Principle of integrating multifamily development throughout the community.

-One of the City's policies in this regard is to "Promote inclusive and economically integrated neighborhoods that allow a diverse mix of residents and housing types." P. 33. Approval if this duplex application furthers this City policy because it would allow a mix of housing types in this neighborhood.

Attached hereto as Exhibit 5 are copies of selected pages from the City's Comprehensive Plan and incorporated herein regarding the above provisions.


2.     The consistency with the PUD standards of Section 14-902, including the statement of purpose.

-The subject property was previously zoned R30/PUD by the City. Obviously, because the City has already designated the subject property as PUD, a plan like the one proposed by the applicant for a use that is specifically permitted in that zoning district would be consistent with the PUD standards including the statement of purpose.


3.     The nature and extent of Common Open Space in the PUD.
-The preliminary development plan provides for open space at the south end.


4.     The reliability of the proposals for maintenance and conservation of Common Open

Space.

-the duplex development would be marketed to 65 and older and Isosceles Properties proposed an HOA to maintain the grounds.

5.      The adequacy or inadequacy of the amount and function of Common Open Space in terms of the densities and dwelling types proposed in the plan.

-In the pre-application videoconference the city staff representative, Mr. Stuart Borders, said he did not know what this criteria was about. Isosceles Properties has complied with this criteria in that the Common Open Space is adequate for 2-unit houses at about 8.6 units per acre and city staff admits that the detention basin for storm water runoff in this area would address existing storm water drainage issues and the new impervious surfaces created by the duplex development.

6.      The extent to which the proposed use will adversely affect the capacity of safety portions of the street network or present parking problems in the vicinity of the property. Whether adequate provisions for public services, provides adequate control over vehicular traffic, and furthers the amenities of light and air, recreation and visual enjoyment.

-No parking problems in the vicinity of the property will be caused as adequate off-street parking is provided in the duplex project. In other words, the City has an ordinance mandating the number of off-street parking spaces that must be provided by a project like the duplex development and the duplex application meets the City's off street parking requirements of the UDO. Compliance with the City's requirements means no adverse effect on safety portions of the street network either. The plaintiff consulted with a traffic engineer and the proposed units will have essentially the same traffic impact as a single family home. Attached hereto as Exhibit 4 and incorporated herein is the traffic engineer's letter that was submitted and made part of the record in this case at the Planning Commission hearing. No traffic engineer rebutted that letter. In addition, there are no issues with sewer service, either.

7.      The extent to which the proposed use will have a substantially adverse effect on adjacent property and the development or conservation of the neighborhood area.

-The proposed use will not have a substantially adverse effect on adjacent property. The proposed use is residential use. The adjacent use is residential use. The future land use map designates the area as residential. The proposed residential use is specifically permitted in the existing zoning on the subject property. The approval of a specifically permitted residential use on the subject property will not have a substantial adverse effect on adjacent property. Furthermore, the proposed project will constitute new investment in a neighborhood that hasn't seen much, if any, new investment lately. Furthermore, a project to be marketed to 65 and older, which would allow persons in the neighborhood to age in place, would not have a substantial adverse effect on adjacent property. New investment in a permitted residential use, at a density less than a third of what would be allowed by the zoning, that would have similar architectural features as that of the surrounding neighborhood, in a city whose comprehensive plan encourages a mix of housing types in neighborhoods means no substantial adverse effect on adjacent property. The applicant

21

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

consulted with a knowledgeable realtor in this regard she submitted her letter at the Planning Commission hearing. Attached hereto as Exhibit 6 and incorporated herein is a copy of the Realtor's letter.

8.    Whether potential adverse impacts have been mitigated to the maximum practical extent.

-In the pre-application videoconference call staff did not identify any adverse impacts. Services are adequate to serve the project. Off street parking that complies with the City's requirement is provided. Density is less than a third of what is allowed under the existing zoning. The use is a permitted use under the existing zoning. Therefore, potential adverse impacts were mitigated to the maximum practical extent.

9.    Whether the Preliminary Development Plan represents such a unique development proposal that it could have accomplished through use of (non-PUD) conventional zoning regulations.

-N/A. This criteria is obviously for an application seeking a PUD overlay. The subject property already has the PUD designation. The R30 zoning required the PUD designation according to the UDO. Therefore, this criteria is not applicable to this application.

10.    The sufficiency of the terms and conditions proposed to protect the interest of the public and the residents of the PUD in the case of a plan that proposes development over a period of years.

The draft covenants submitted by Isosceles Properties prior to the Planning Commission

vote protected the interests of the public and residents of the PUD.

147.    In addition, the reasons given by the City's staff for recommending denial were not

applicable and were without merit because of, but not limited to, the following

reasons/Exhibits:

| Staff reason for denial | Why staff reason is not credible |
|---|---|
| 1. Residential infill standards of 14-505-06 won't be met | 14-505 is not a use standard that applies to the R-30/PUD two unit house use. See table 300-1. Even if it applies, plaintiff complies. |
| 2.Traffic flow and parking problems | Plaintiff meet the city's off street parking requirements and staff admits the same in its report. |
| 3.Storm and sanitary systems are operating near their limits | See attached Exhibit 7 from from Plan.Commn. hearing Indep. Public works email stating that the change for a previous 32 unit proposal would "…be within the pump station operating range." Obviously, if 32 |

22

|  | units could be handled, plaintiff's 22 units can be handled. |
|---|---|
| 4.Applicant did not provide rough draft of CCRs | Plaintiff did provide a rough draft of the CCRs before the Planning Commission vote. See Exhibit 7 attached and incorporated. |
| 5.The amenity provided (a gazebo) is not adequate | A gazebo was an amenity suggested by staff. Plaintiff selected it. And now staff says not adequate. That's not reasonable. See Exhibit 8 attached and incorporated here. |

148. The City's denial of the duplex application, Ordinance 20-076, was not based on a substantial relationship to a legitimate public purpose or applicable or appropriate criteria and instead was based on a desire to appease a group of neighborhood opponents.

149. The City's denial of the duplex application deprives Plaintiff of an opportunity to develop the subject property in accordance with the federal opportunity zone designation and receive the benefits of developing in an opportunity zone.

150. Isosceles Properties presented competent and substantial evidence in support of the duplex application, Ordinance 20-076.

151. The City's denial of the duplex application was not based on UDO criteria.

152. Plaintiff's competent and substantial evidence in support of the duplex application proved, among other things, that the duplex application was consistent with the character of the neighborhood and that the subject property was adaptable to the duplex development.

153. Plaintiff's duplex development conserves the value of buildings.

154. Plaintiff's duplex development encourages the most appropriate use of land.

155. Plaintiff's duplex development does not cause pollution.

156. Plaintiff's duplex development does not cause environmental harm.

157. There is no market indication of a negative effect on neighboring properties from the duplex development.

23

158. There is a need in the community for Plaintiff's proposed use of the subject property.

159. The proposed duplex development will have a positive economic impact on the community.

160. Sidewalks that would be provided with the duplex development would improve connectivity.

161. As a result of the City's denial of the duplex application, Ordinance 20-076, Plaintiff cannot use the subject property for his investment backed expectations.

    Denial of the duplex application has resulted in substantial damages and detriment to Plaintiff in the form of lost business opportunities, loss of investment backed business expectancies and property value. Plaintiff cannot utilize and enjoy the subject property under the existing circumstances.

## COUNT I - DECLARATORY JUDGMENT

162. Plaintiff incorporates by reference herein all of the allegations, statements and averments in paragraphs 1 through 161 with the same force and effect as if fully set forth herein.

163. Plaintiff has a specific and legally cognizable interest in the subject matter of the City's decision.

164. The City's decision has a direct and substantial impact on Plaintiff's personal or property rights or interests and Plaintiff's property value.

165. The City's refusal to allow Plaintiff to develop the subject property in accordance with a permitted use under the existing R30/PUD zoning district that meets applicable UDO criteria is unreasonable.

166. Plaintiff's private detriment resulting from the City's denial of the duplex application

24

outweighs any alleged public interest in keeping the subject property undeveloped and underutilized.

167. There was no legitimate public interest identified by the City in denying the duplex application and keeping the subject property undeveloped and underutilized.

168. The private costs of failure to approve a duplex development for the subject property outweighs the benefit the general public purportedly enjoys by keeping the subject property undeveloped and underutilized.

169. The general public enjoys no benefit by keeping the subject property undeveloped and underutilized.

170. The duplex development would have a positive impact on the value of the subject property.

171. The denial of the duplex development, Ordinance 20-076, does not substantially relate to the public welfare.

172. The denial of the duplex development, Ordinance 20-076, is considered unconstitutionally unreasonable because the detriment to Plaintiff's private interests outweighs the public benefit from keeping the property undeveloped and underutilized.

173. There was no substantial evidence regarding the reasonableness of the denial of the duplex application, Ordinance 20-076.

174. The failure to approve the duplex application adversely affects the use(s) of the subject property.

175. The failure to approve the duplex application adversely affects the value of the subject property.

176. Approval of the duplex application would not have caused traffic flow and parking

25

problems on Pleasant and Spring streets.

177. Approval of the duplex application would not have caused a negative impact on the other adjoining properties.

178. The City did not have any competent and substantial evidence presented by the opposition to justify its decision to deny the duplex application, Ordinance 20-076.

179. The City's actions, when viewed in the light of the facts existent at the time of its decision to deny the duplex application, Ordinance 20-076, were not fairly debatable.

180. The City's action was arbitrary, capricious and unreasonable.

181. At the time the City refused to approve the duplex application, it had no evidence before it that justified its refusal to approve the duplex application.

182. The City did not show that its refusal to approve the duplex application, Ordinance 20-076, would substantially further the public health, safety and welfare of the City and its inhabitants.

183. The City's refusal to approve the duplex application, Ordinance 20-076, does not permissibly advance a legitimate interest of the State of Missouri.

184. The City's refusal to approve the duplex application, Ordinance 20-076, does not permissibly advance a permissible regional or municipal interest.

185. There was no evidence before the City proving that the duplex development was unreasonable.

186. The City had no evidence before it that the duplex development for the subject property would cause overcrowding of land.

187. The City had no evidence before it that the duplex development would create undue

26

concentration of population.

188. The City had no evidence before it that the duplex development for the subject property would result in an overcrowding of land and an undue concentration of population.

189. The City did not have competent and substantial evidence before it that the proposed duplex development for the subject property was not economically feasible.

190. The City's actions were influenced solely by the opposition of a few people and were not based upon sound principles of land use planning and development and were not for the good of the public as a whole.

191. In denying the duplex application, the City did not give consideration to the criteria listed in the UDO.

192. In denying the duplex application, the City did not make its decision in accordance with goals and objectives of the Comprehensive Plan.

193. The City's action in refusing to grant approval of Plaintiff's duplex development amounted to an unlawful delegation of the legislative power to the opposition.

194. Article XI, Section 3 of the Missouri Constitution states: "Section 3. Exercise of police power with respect to corporations. The exercise of the police power of the state shall never be surrendered, abridged, or construed to permit corporations to infringe the equal rights of individuals, or the general well-being of the state."

195. The actions of the City were a violation of Plaintiff's substantive and procedural due process rights guaranteed by the United States Constitution, and the Constitution of the State of Missouri.

196. The exercise of illegal police powers by the City was unreasonable.

27

197.     The exercise of illegal police powers by the City was arbitrary.

198.     The exercise of illegal police powers by the City was discriminatory.

199.     The exercise of illegal police powers by the City was capricious.

200.     Plaintiffs have exhausted their administrative remedies.

201.     The actions of the City in denying the duplex application were not based on competent and substantial evidence.

202.     The action of the City in refusing to allow Plaintiff to develop the subject property in accordance with use permitted under the very zoning district the City placed on the subject property at a density substantially less than what would be allowed by that zoning district, when viewed in light of the city's position on the prior application, is unreasonable, arbitrary, discriminatory and capricious and results in damage to Plaintff.

203.     Plaintiffs have no other adequate remedy at law.

204.     The issue of whether or not the City's refusal to approve the duplex development, Ordinance 20-076, was unreasonable, arbitrary, discriminatory and capricious is ripe for determination.

205.     Because of the foregoing, a controversy presently exists between Plaintiff and the City; that the interests of Plaintiff and the City are in fact adverse.

206.     Plaintiff has a legally protectable interest involved; and it is timely that judicial determination be made, that this Court's declaratory judgment would terminate uncertainties causing these controversies.

207.     To grant declaratory and any other appropriate relief herein would avoid multiplicity of litigation.

28

WHEREFORE, Plaintiff prays this Court enter its Judgment in favor of Plaintiff and against the City:

1.   Declaring that because the duplex application, Ordinance 20-076, met applicable criteria and that Plaintiff submitted competent and substantial evidence in support of applicable criteria, the duplex application, Ordinance 20-076, for the subject property should have been approved by the City.

3.   Declaring that there was no competent and substantial evidence to support the City's decision to refuse to approve the duplex application, Ordinance 20-076.

4.   Declaring that when the City's decision is viewed in the light of the facts existent at the time of its decision to refuse to approve the duplex application, that decision was not fairly debatable.

5.   Declaring that the City did not show that its refusal to approve the duplex application substantially furthered the public health, safety and welfare of the city and its inhabitants, nor does the City's refusal to approve the duplex application permissibly advance a permissible regional or municipal interest or a legitimate interest of the State of Missouri or of the City.

6.   The exercise of illegal police powers by the City was unreasonable, arbitrary, discriminatory, capricious and the City's vote to deny is reversed and the duplex application, Ordinance 20-076, is approved.

7.   Awarding Plaintiff its reasonable attorney's fees and Court costs incurred herein; and

8.   Awarding Plaintiff any other relief that is just and proper in the circumstances.

29

## COUNT II
## EQUAL PROTECTION UNDER THE MISSOURI CONSTITUTION, ARTICLE I, SECTION 2 AND THE 14TH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATE OF AMERICA

208. Plaintiff incorporates by reference herein all of its allegations, statements and averments in paragraphs 1 through 207 with the same force and effect as if fully set forth herein.

209. The City has violated Article I, Section 2 of the Missouri Constitution by selectively creating more rigid restrictions on the approval of Plaintiff's duplex application; that all applicants for preliminary development plan approval in the R30/PUD district are not treated equally depending on who makes the application.

210. Upon information and belief, the City has not applied the legal protest provisions in the UDO to a property already the subject of the PUD designation like it did to Plaintiff and upon information and belief the City has not denied a preliminary development plan in an R30/PUD district in the last decade.

211. The City has violated the 14th Amendment to the Constitution of the United States of America by selectively creating more rigid restrictions on the approval of Plaintiff's duplex application.

212. As applied to Plaintiff, the City's application of the legal protest provisions to the duplex application and invoking the supermajority vote requirement prior the City Council voting on the duplex application singled out Plaintiff and its property and thereby constituted selective and discriminatory legislations and the City's refusal to approve Plaintiff's preliminary development plan, even though it met applicable criteria, singles out Plaintiff and its real property and thereby constitutes selective and discriminatory legislation.

30

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

213. There was no valid reason to either apply the legal protest provisions and invoke the supermajority vote requirement before the vote on the duplex application was taken or to deny the preliminary development plan requested for the subject property and as a result the City treated Plaintiff disparately from others similarly situated.

214. The City's imposition of legal protest requirements and the City's denial of Plaintiff's preliminary development plan, and its approval of preliminary development plan approval requests to other similarly-situated people and properties and not applying legal protest provisions on other applications involving property already designated PUD, represents a legislative distinction that is neither rationally nor reasonably related to a legitimate public purpose, does not bear a fair and substantial relation to the object of legislation, results in purposeful, disparate, unequal and discriminatory treatment of similarly situated people, properties and uses, and otherwise unconstitutionally and illegally discriminates against Plaintiff in violation of Article I, Section 2 of the Missouri Constitution and the 14th Amendment of the Constitution of the United States of America.

215. The City's refusal and failure, to regulate all similarly situated people, property and uses is a clear violation of its authority, represents bad faith and improper purpose, improperly draws regulatory distinctions, and violates the equal protection provisions of Article I, Section 2 of the Missouri Constitution.

216. There is no valid public purpose behind the City's denial of the preliminary development plan submitted by Plaintiff or imposition of legal protest provisions.

217. As a direct and proximate result of the City's disparate, unequal, and discriminatory actions and treatment as aforesaid, Plaintiff has been injured and damaged in an amount which it

31

is unable to calculate with certainty at this time.

WHEREFORE, in Count II, Plaintiff prays for Judgement in its favor and against the City and that the Court determine that the City's denial of the preliminary development plan is unconstitutional and is of no force or effect and that the City's actions violated Plaintiff's rights guaranteed by Article I, Section 2 of the Missouri Constitution, that the City's actions in refusing to adopt the ordinance approving Plaintiff's preliminary development plan violated Plaintiff's rights guaranteed by the 14th Amendment to the Constitution of the United States of America, that the Court declare the preliminary development plan is approved and enter judgment against the City in an amount that is reasonable and proper according to the proof and interest, for its costs and expenses herein incurred and expended, including reasonable attorneys' fees, and for such other, additional and further relief as the Court deems just and proper.

## COUNT III
## (DAMAGES FOR VIOLATION OF 42 U.S.C. SECTION 1983)

218. Plaintiff incorporates by reference herein all of its allegations, statements and averments in paragraphs 1 through 217 with the same force and effect as if fully set forth herein.

219. Defendant City has deprived Plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States.

220. Defendant City was acting under color of state law at the time of the conduct constituting the deprivation.

221. The refusal to approve the duplex application and approve the requested preliminary development plan and otherwise allow Plaintiff to proceed with developing the subject property with a use that is expressly permitted by the existing zoning the City placed on the subject property has resulted in substantial damages and detriment to the Plaintiff in

32

the form of lost property values and lost business opportunities and loss of investment backed business expectancies; that Plaintiff cannot utilize and enjoy the subject property under the existing circumstances; that Plaintiff has been denied the privileges which were intended to extend to property owners in Independence, Missouri.

222. When the Defendant City denied Plaintiff's request for preliminary development plan approval and refused to approve the duplex application and refused to adopt Ordinance 20-076 approving the preliminary development plan, it had no evidence that the denial would substantially further the public health, safety and welfare of the City and its inhabitants.

223. The City's denial of the duplex application and refusal to approve the preliminary development plan and adopt Ordinance 20-076 approving the preliminary development plan does not advance any legitimate interest of the City, because Plaintiff's duplex development would not have negatively affected the health, safety and welfare of the public.

224. The exercise of illegal police powers here by the City was unreasonable, arbitrary, discriminatory and capricious.

33

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

225.    The actions and course of conduct of Defendant City deprived Plaintiff of its right to procedural and substantive due process secured by Article I, Section 10 of the Missouri Constitution, Article I, Section 2 of the Missouri Constitutional and the Fifth and Fourteenth Amendments to the United States Constitution; that Plaintiff was injured and damaged by such acts and conduct of the City in an amount of money which Plaintiff is unable to state at this time with complete certainty.

226.    The decisions, actions, and course of conduct of the City are and were under color of law and deprived Plaintiff of its constitutional rights to procedural due process in violation of 42 U.S.C. Section 1983.

227.    The decisions, actions, and course of conduct of the City are and were under color of law and deprived Plaintiff of its constitutional rights to equal protection in violation of 42 U.S.C. Section 1983.

228.    Defendant City's arbitrary and unreasonable refusal to approve the duplex application and refusal to adopt Ordinance 20-076 and approve the preliminary development plan and otherwise allow Plaintiff to proceed with developing the subject property with a use that is expressly permitted by the existing zoning the City placed on the subject property, which was done under color of official regulations, customs, usages, and ordinances of the City are in violation of Plaintiff's rights, privileges and immunities as guaranteed by the laws of the State of Missouri, the Missouri Constitution, the laws of the United States of America, and the Constitution of the United States of America, specifically:

A.      The arbitrary and unreasonable refusal to grant Plaintiff's request in the duplex application and refusal to approve the requested preliminary development plan and refusal to adopt Ordinance 20-076 and otherwise allow Plaintiff to proceed with developing the

34

subject property with a use that is expressly permitted by the existing zoning the City placed on the subject property is a violation of rights guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution and Article I, Section 10 and Section 2 of the Missouri Constitution, and

B.      Remedies for such violations of Plaintiff's rights are provided by Article 42, United States Code, Sections 1983 and 1988.

229.    As a direct and proximate result, Plaintiff has suffered and will suffer damages which it is entitled to recover under state law and 42 U.S.C. Section 1983.

230.    As a direct and proximate result of the above, Plaintiff has suffered special damages which damages are continuing, and other expenses which they are entitled to recover pursuant to 42 U.S.C. Section 1983 and State law.

231.    Plaintiff is further damaged by having to incur attorney's fees in the prosecution of this claim and such fees can be recovered under 42 U.S.C. Section 1988.

232.    That Plaintiffs are damaged in the amount of at least FIVE HUNDRED SEVENTY TWO THOUSAND NO/100 DOLLARS ($572,000.00).

WHEREFORE, Plaintiff prays for Judgment in its favor and against the City:

A.      Awarding Plaintiff such damages from Defendant City in excess of an amount of FIVE HUNDRED SEVENTY TWO THOUSAND NO/100 DOLLARS ($572,000.00) as will compensate it for Defendant City's violation of its constitutional rights as set forth above;

B.      Order that the duplex application and the ordinance approving the preliminary development plan are hereby approved.

C.      Awarding Plaintiff's reasonable attorneys' fees and costs pursuant to 42 U.S.C.

35

Section 1983 and Section 1988 and Section 527.010 Mo. Rev. Stat. Et seq.; and

D.     For such other and further relief as this court may deem just and proper.

<div align="center">

**COUNT IV**
**TEMPORARY REGULATORY TAKING WITHOUT JUST COMPENSATION**

</div>

233.    Plaintiff incorporates by reference herein all of its allegations, statements and averments in paragraphs 1 through 232 with the same force and effect as if fully set forth herein.

234.    Plaintiff has been unable to beneficially use the subject property for a use permitted under the existing R30/PUD zoning as a result of the City's refusal to approve the duplex application.

235.    The City's refusal to approve the duplex application left the subject property economically infeasible to develop under the R30/PUD classification.

236.    The City's refusal to approve the duplex application, a use expressly permitted in the R30/PUD district, has forced Plaintiff to leave the subject property economically idle.

237.    The City's refusal to approve the duplex application deprived Plaintiff of all of the economically beneficial or productive use of the subject property.

238.    The City's refusal to allow the subject property to be developed with a use permitted in the existing zoning district which is the duplex application is unreasonable, arbitrary, capricious and unconstitutional as applied to the subject property; it is not required to promote the public safety, health, convenience, comfort, morals, prosperity, or general welfare of Independence.

239.    The City's refusal to approve the duplex application and approve the preliminary development plan for the subject property constitutes a temporary regulatory taking in that Plaintiff has been deprived of all economically beneficial or productive use of the subject property as it is not economically feasible to develop the subject property otherwise in light

<div align="center">36</div>

of the City's position on the prior application and on the duplex application, and, thus, Plaintiff has been forced to leave the subject property economically idle.

240.    The City's refusal to approve the duplex application constituted an invasion and/or an appropriation of Plaintiff's property rights as its legal and proper right to use and develop the subject property.

241.    The City deprived Plaintiff of its property right by not approving the preliminary development plan which is the duplex application for the subject property.

242.    The City deprived Plaintiff of its right to just compensation for the taking of private property.

243.    The economic impact of the City's refusal to approve the preliminary development plan for the subject property that is the duplex application is substantial; that such economic impact has damaged Plaintiff in the amount of at least FIVE HUNDRED SEVENTY TWO THOUSAND NO/100 DOLLARS ($572,000.00).

244.    The City's refusal to approve the duplex application has deprived and/or interfered with Plaintiff's distinct investment backed expectations.

245.    The character of the City's action in refusing to approve the duplex application is that it was unreasonable, arbitrary, capricious and unconstitutional as applied to the subject property; it is not required to promote the public safety, health, convenience, comfort, morals, prosperity, or general welfare of Independence.

246.    Because of the City's refusal to approve the duplex application, Plaintiff will be forced to leave the subject property economically idle for a period of time which time is from November 16, 2020 until such time as the City is directed to identify the subject property as having a preliminary development plan approved for it that is the duplex application

37

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

proposed by Plaintiff (the Temporal Time Period of the Taking by the City"); that such time delay is not a normal delay.

247. The City's refusal to approve the duplex application further deprived Plaintiff of its rights, privileges, immunities, and protections granted by the laws of the State of Missouri, the Missouri Constitution, the laws of the United State of America, and the Constitution of the United States of America.

248. The City was acting under the color of state law at the time it refused to approve the duplex application, Ordinance 20-076.

249. The City's denial of the duplex application has a negative impact on Plaintiff during the Temporal Time Period of the Taking by the City.

250. The City's denial of the duplex application interferes with distinct investment backed expectations during the Temporal Time Period of the Taking by the City.

251. In denying the duplex application the City did not adjust the benefits and burdens of economic life to promote the common good during the Temporal Time Period of the Taking by the City.

252. When focusing on the magnitude of the City's regulations' economic impact on Plaintiff and the subject property and the degree to which it interferes with legitimate property interests of Plaintiff, it is clear that the City's regulation damaged Plaintiff during the Temporal Time Period of the Taking by the City.

253. The City's denial of the duplex application imposes an actual burden on Plaintiff's property rights during the Temporal Time Period of the Taking by the City.

254. The burden of leaving the property undeveloped and underutilized was not allocated amongst the public during the Temporal Time Period of the Taking by the City.

38

255. The City's denial of the duplex application constituted an ouster of Plaintiff's property rights during the Temporal Time Period of the Taking by the City.

256. The City's activities in refusing to approve the duplex application, Ordinance 20-076, have already worked a taking of all use of the subject property and no subsequent action by the City can relieve it of the duty to provide compensation for the period of time which this taking is effective; that reversing the City's denial of the duplex application without payment of fair value for the use of the subject property during such period would be a constitutionally insufficient remedy.

257. The economic impact of the City's refusal to approve the duplex application, Ordinance 20-076, has also damaged Plaintiff in that it has incurred attorney's fees and court costs in this action for which it is entitled to compensation.

WHEREFORE, Plaintiff respectfully requests that this Court grant to it the relief that it has requested herein namely compensation that Plaintiff believes is in the amount of not less than FIVE HUNDRED SEVENTY TWO THOUSAND NO/100 DOLLARS ($572,000.00) and interest for the period of time from November 16, 2020 to the date the duplex application, Ordinance 20-076, which is the period of time this taking is effective; Order that the duplex application and Ordinance 20-076 and the preliminary development plan are approved; award to Plaintiff its reasonable attorneys' fees and costs incurred herein and; award any and all other relief as the Court deems just and proper in the circumstances.

## COUNT V – INVERSE CONDEMNATION

258. Plaintiff incorporates by reference herein all of its allegations, statements and averments in paragraphs 1 through 257 with the same force and effect as if fully set forth herein.

259. The City has forced Plaintiff to leave its subject property as green space or open space as

39

an alleged benefit for others in the neighborhood all without any compensation to Plaintiff.

260.    The subject property was taken by the City for alleged public use without any just compensation to Plaintiff by the City.

261.    The City inversely condemned the subject property as alleged open space or alleged green space for use by others.

262.    The subject property has been damaged by the City for the alleged public use without just compensation.

263.    The City's refusal to allow Plaintiff to develop the subject property with a use expressly permitted by the existing zoning on the subject property was an invasion of a valuable property right and consequential damages for the taking are appropriate.

264.    The economic impact of the City's inverse condemnation of the subject property is an amount of money which Plaintiff is unable to calculate with certainty at this time.

265.    The economic impact of the City's inverse condemnation of the subject property also requires compensation for the attorney's fees and court costs incurred by Plaintiff herein.

WHEREFORE, Plaintiff prays for Judgment in its favor and against the City; for judgement against the City in an amount that is reasonable and proper according to proof and interest, for its court costs and expenses herein incurred including reasonable attorney's fees and for such other, additional and further relief as the Court deems just and proper.

Plaintiff demands a jury trial.

40

RESPECTFULLY SUBMITTED:
THE ROE LAW FIRM LLC

By: _____ /s/John W. Roe _____
John W. Roe                 MO #34878
Corporate Hills North
4444 N. Belleview Ave., Suite 208
Kansas City, MO   64116
Phone: (816) 421-9000
Facsimile: (816) 421-9001
Email: jroe@theroelawfirm.com
LEAD    ATTORNEY    OF    RECORD    FOR
PLAINTIFF

41

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

RECORDER'S CERTIFICATION
JACKSON COUNTY, MISSOURI
06/12/2003 04:24:22 PM
INSTRUMENT TYPE: PLAT   FEE: $65.00   2 Pages
NON-STANDARD FEE:   EXEMPT




INSTRUMENT NUMBER/BOOK & PAGE:
**2003I0070054**
Book: 77 Page: 11
ROBERT T. KELLY, DIRECTOR OF RECORDS

## Jackson County
## Department of Records
# Exempt Document

This document has been recorded under exempt status pursuant to
RSMo 59.310.4.
This certificate has been added to your document in compliance
with the laws of the state of Missouri.



### Robert T. Kelly, Director of Records
415 E. 12th Street, Room 104      308 W. Kansas, Suite 104
Kansas City, MO  64106            Independence, MO  64050

This page has been recorded as a permanent part of your document. Please do not remove.

**EXHIBIT**

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM



## DIVISION OF FINANCE
## COLLECTION DEPARTMENT

**JACKSON COUNTY COURTHOUSE**
415 EAST 12TH STREET (FIRST FLOOR)
KANSAS CITY, MISSOURI 64106

**TAXPAYER SERVICES (816) 881-3232**
**BUSINESS TAXES (816) 881-3186**

### TAX CERTIFICATE FOR PLAT

**INSTRUCTIONS TO TAXPAYER**

1. Have Part I of this Tax Certificate completed by the Mapping Section of the Assessment Department.

2. Take to Taxpayer Services at either the Kansas City or Independence Courthouse. They will complete Parts II and III.

3. You cannot record your plat until these steps are completed.

**PART I:** TO BE COMPLETED BY ASSESSMENT DEPARTMENT
(Use one form for each parcel number)

Legal Description: (RTS OR SUB) _Solid Rock Addition (2004 plat)_

_____

_____

_____

Current County Parcel/ID # _15-520-09-20_  '02, '01, '00
BY _Kelly K. P?_ DATE _6/12/03_

**PART II:** TO BE COMPLETED BY COLLECTION DEPARTMENT
(Return to Mapping Section, Assessment Department if unable to follow payment history back three years. Attach documentation if paid. Attach bill if taxes due).

| YEAR | AMOUNT DUE | DATE PAID | VERIFIED BY |
|------|------------|-----------|-------------|
|      | Exempt     | Mal       |             |
|      |            |           |             |
|      |            |           |             |

**PART III:** TO BE COMPLETED BY AUTHORIZED COLLECTION DEPARTMENT SUPERVISOR
(This is to certify, that according to the records of the Collection Department, the State, County and School Taxes for Real Property have been paid in full for _2002_ and all prior years for the above described property.)

_6/12/03_ _MA?_
DATE        SUPERVISOR



Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

ELECTRONICALLY RECORDED
JACKSON COUNTY, MISSOURI
**03/24/2017 11:23:27 AM**
WD       FEE: $  24.00     2   Pages
INSTRUMENT NUMBER:
**2017E0025733**

## CORPORATION WARRANTY DEED
(Corporation Conveying to Corp/LLC/Partnership)

File No.: 17014926 - CLT

THIS INDENTURE, made on _____3-21-17_____, by and between Compassion in Action, a not-for-profit corporation, a corporation duly organized under the laws of the County of Jackson, State of Missouri, Grantor, and Isosceles Properties, LLC, Grantee.

Grantee's mailing address is: _1308 NE Windsor Dr., Lees Summit, Mo 64086_

WITNESSETH, THAT THE SAID GRANTOR, in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration to it paid by the said GRANTEE (the receipt of which is hereby acknowledged) does by these presents GRANT, BARGAIN, and SELL, CONVEY and CONFIRM unto the said GRANTEE, its successors and assigns, the following described lots, tracts or parcels of land lying, being and situate in the County of Jackson and State of Missouri, to wit:

Lot 1, SOLID ROCK ADDITION, a subdivision in Independence, Jackson County, Missouri.

Subject to easements, restrictions reservations, and covenants of record, if any.

TO HAVE AND TO HOLD the premises aforesaid, with all and singular the rights, privileges, appurtenances and immunities thereto belonging or in anywise appertaining unto the said Grantee and unto its successors and assigns forever; the said Grantor hereby covenanting that it is lawfully seized of an indefeasible estate in fee of the premises herein conveyed; that it has good right to convey the same; that the said premises are free and clear from any encumbrance done or suffered by it or those under whom it claims; and it will warrant and defend the title to said premises unto the said Grantee and unto its successors and assigns forever, against the lawful claims and demands of all persons whomsoever.

**EXHIBIT**
2

IN WITNESS WHEREOF, the said Grantor has caused these presents to be signed by its President and attested by its Secretary, and the corporate seal to be hereto attached, the day and year first above written.

Compassion in Action, a not-for-profit corporation

BY: _____

Michael L. Roach
President


STATE OF MISSOURI
COUNTY OF JACKSON

On this _____ 3-21-17 _____, before me, Stacey Brodersen, a Notary Public in and for said state, personally appeared Michael L. Roach, President of Compassion in Action, a not-for-profit corporation known to me to be the person who executed the within Corporation Warranty Deed in behalf of said corporation and acknowledged to me that he/she executed the same as the free act and deed of said Corporation.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year last above written.

_____
Notary Public · Stacey Brodersen
My Commission Expires: September 11, 2020

STACEY BRODERSEN
Notary Public - Notary Seal
STATE OF MISSOURI - JACKSON COUNTY
My Commission Expires: Sept. 11, 2020
Commission# 12535944

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

### Kentucky Place
AN ODGECILEO PROPERTIES, LLC DEVELOPMENT

### GENERAL LOCATION MAP
SCALE 1: NO SCALE

**Caton Architectural Design**

### LANDSCAPE PLAN
SCALE 1" = 40'-0"

*PLANT SCHEDULE*

### NORTH-SOUTH SECTION
SCALE 1" = 40'-0"

### EAST-WEST SECTION
SCALE 1" = 30'-0"

Kentucky Place

SHEET NUMBER
SP1

EXHIBIT
3

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM





**SITE PLAN - EXISTING CONDITIONS**



PRELIMINARY SITE PLAN
**KENTUCKY PLACE**
LOT 1, SOLID ROCK ADDITION
CITY OF INDEPENDENCE
JACKSON COUNTY, MISSOURI

PRELIMINARY SITE PLAN

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM



LEFT ELEVATION
SCALE: 1/4"=1'-0"

FRONT ELEVATION
SCALE: 1/4"=1'-0"

RIGHT ELEVATION
SCALE: 1/4"=1'-0"

REAR ELEVATION
SCALE: 1/4"=1'-0"

SIDING VARIATIONS TO BE USED WITH MULTIPLE COLOR PALLETES

Caton
Architectural
Design LLC

KENTUCKY PLACE

A101

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM



PRELIMINARY PLAT
# KENTUCKY PLACE
A REPLAT OF LOT 1, SOLID ROCK ADDITION
A SUBDIVISION IN THE CITY OF INDEPENDENCE
JACKSON COUNTY, MISSOURI

Bryan Hill, PLS

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM



July 16, 2020

Shawn Caton, AIA
Caton Architectural Design
6320 Marion Avenue
Kansas City, MO 64133

SUBJECT      Trip Generation Summary
Kentucky Hills Development
Independence, Missouri

Dear Mr. Caton:

Merge Midwest Engineering LLC has completed a trip generation estimate for the addition of eleven duplexes in the Kentucky Hills Development located in Independence, Missouri.

Trip-generation estimates were calculated for the proposed development based upon the 10th edition + Supplement of the Institute of Transportation Engineers (ITE) "*Trip Generation Handbook*". The handbook no longer provides a specific land-use code for duplexes. The available applicable residential land-uses are:

- 210 - Single-Family Detached Housing
- 220 - Multifamily Housing (Low-Rise)

The description of low-rise multifamily states that it must have at least three other dwelling units. For purposes of trip generation, the land use code of single-family detached housing is the most appropriate for estimating duplex traffic for this development.

| Table 1 – Trip Generation | | | | | AM Peak Hour (VPH) | | | PM Peak Hour (VPH) | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Land Use | | Qty | Unit | ADT (VPD) | Total | In | Out | Total | In | Out |
| 210 | Single-Family Detached Housing | 22 | DU | 258 | 20 | 5 | 15 | 24 | 15 | 9 |
| | | | TOTALS | 258 | 20 | 5 | 15 | 24 | 15 | 9 |

EXHIBIT
4

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM



As shown in the table, a total of 20 vehicles per hour (vph) would be expected to be generated from the proposed development during the A.M. peak hour (5 inbound and 15 outbound), and 24 vph during the P.M. peak hour (15 inbound and 9 outbound). Therefore, the proposed impact of the 11 two-home duplexes would be expected to be minimal, even when estimated as single-family homes. The trip generation calculations are attached to this letter.

Please do not hesitate to contact me should you have any questions or need additional information.

Sincerely,
**Merge Midwest Engineering, LLC**

Janelle M. Clayton, P.E., PTOE
Manager / Co-Owner

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

# Single-Family Detached Housing
## (210)

| | |
|---:|:---|
| **Vehicle Trip Ends vs:** | **Dwelling Units** |
| **On a:** | **Weekday** |

| | |
|---:|:---|
| **Setting/Location:** | **General Urban/Suburban** |
| Number of Studies: | 159 |
| Avg. Num. of Dwelling Units: | 264 |
| Directional Distribution: | 50% entering, 50% exiting |

## Vehicle Trip Generation per Dwelling Unit

| Average Rate | Range of Rates | Standard Deviation |
|:---:|:---:|:---:|
| 9.44 | 4.81 - 19.39 | 2.10 |

## Data Plot and Equation



X  **Study Site**  ——————  **Fitted Curve**   **Average Rate**

**Fitted Curve Equation:** Ln(T) = 0.92 Ln(X) + 2.71   **R²= 0.95**

*Trip Gen Manual*, 10th Ed + Supplement   ● Institute of Transportation Engineers

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

# Single-Family Detached Housing
## (210)

| | | |
|---|---|---|
| **Vehicle Trip Ends vs:** | **Dwelling Units** | |
| **On a:** | **Weekday,** | |
| | **Peak Hour of Adjacent Street Traffic,** | |
| | **One Hour Between 7 and 9 a.m.** | |
| **Setting/Location:** | **General Urban/Suburban** | |
| Number of Studies: | 173 | |
| Avg. Num. of Dwelling Units: | 219 | |
| Directional Distribution: | 25% entering, 75% exiting | |

## Vehicle Trip Generation per Dwelling Unit

| Average Rate | Range of Rates | Standard Deviation |
|---|---|---|
| 0.74 | 0.33 - 2.27 | 0.27 |

## Data Plot and Equation



X    **Study Site**          ─────── **Fitted Curve**                  **Average Rate**

**Fitted Curve Equation: T = 0.71(X) + 4.80**                               **R²= 0.89**

*Trip Gen Manual*, 10th Ed + Supplement    •  Institute of Transportation Engineers

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

# Single-Family Detached Housing
## (210)

| | |
|---|---|
| Vehicle Trip Ends vs: | **Dwelling Units** |
| On a: | **Weekday,** |
| | **Peak Hour of Adjacent Street Traffic,** |
| | **One Hour Between 4 and 6 p.m.** |
| Setting/Location: | **General Urban/Suburban** |
| Number of Studies: | 190 |
| Avg. Num. of Dwelling Units: | 242 |
| Directional Distribution: | 63% entering, 37% exiting |

## Vehicle Trip Generation per Dwelling Unit

| Average Rate | Range of Rates | Standard Deviation |
|---|---|---|
| 0.99 | 0.44 - 2.98 | 0.31 |

## Data Plot and Equation



X = Number of Dwelling Units

X **Study Site**     —— **Fitted Curve**     **Average Rate**

**Fitted Curve Equation:** $Ln(T) = 0.96\ Ln(X) + 0.20$     $R^2 = 0.92$

*Trip Gen Manual,* 10th Ed + Supplement    ● Institute of Transportation Engineers

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

# IMAGINE INDEPENDENCE

## COMPREHENSIVE PLAN 2040

EXHIBIT

tabbies

5

# DEAR FRIENDS:



Community, Family, Progress - these three words describe Independence Missouri. Ours is a City steeped in history. Family ties run deep and in many cases are generations long. From our very beginning, we have been fearlessly committed to progress.

One hundred and seventy-five years ago Independence was teeming with tradesmen selling their wares and families preparing for a life-altering journey as they embarked on the Great Migration of the Oregon Trail. Just six years later in 1849, the City of Independence was officially chartered. From the early pioneers to our residents of today we have embraced grand aspirations and the values of community, family, and progress.

Independence is a nationally recognized City with a unique history and sense of place. Imagine Independence 2040 is a celebration of the successes of the past and the roadmap to our future. We thank the many, many people who share a singular vision for a safe, culturally diverse, family-friendly community with quality neighborhoods, 21st Century jobs, and a growing economy. It is a long-range plan and framework for our to help guide us toward our desired future in 2040. Independence for All is our City's strategic plan for the next five years. Both plans complement each other and are in alignment providing a short-term plan and long-term vision.

Both plans are tools to communicate how we want our City to look, function and how we hope to advance our vision.

The community was actively involved in the development of Imagine Independence 2040. We were blown away by the community's interest and enthusiasm. We had rooms packed full of residents giving their time to help us shape the future of our community. The City received an award from the American Planning Association – Missouri Chapter for outstanding public outreach. And while we are very proud of this award, I am most excited about the ideas these conversations sparked and the momentum that continues to grow in our community.

Michelangelo once said – "The greatest danger for most of us is not that our aim is too high and we miss it, but that it is too low and we reach it." We will continue to set lofty goals for Independence and look for ways to make progress.

I know those residents, tradesmen, and pioneers who took that leap of faith 175 years ago would be proud of the community that developed here, the stories their families have created here, and the progress we continue to share. Community, family, progress -- this is who we are but also where we want to go. Our success depends on the community supporting each other and providing an opportunity for all of our residents to achieve personal success as we progress together.

**Eileen Weir**
Mayor, City of Independence

# ACKNOWLEDGEMENTS

## MAYOR AND CITY COUNCIL
Eileen Weir - Mayor
John Perkins - District 1
Curt Dougherty - District 2
Scott Roberson - District 3
Tom Van Camp - District 4
Chris Whiting - At-Large
Karen DeLuccie - At-Large

## PLANNING COMMISSION
Eric Ashbaugh, Chair
Travis Boley
Virginia Ferguson
John Goldesberry
Cindy McClain, Vice-Chair
Billie Preston
Tina Read

## CITY MANAGER
Zachary Walker

## ASSISTANT CITY MANAGERS
Lauren Palmer
Mark Randall

## PLANNING STAFF
Stuart Borders
Charlie Dissell
Brian Harker
Mary Hunt
Kathy Robertson
Tom Scannell

## CONSULTANTS
Shockey Consulting Services

## STEERING COMMITTEE
Ken Boone
Patrick A. Campbell, Chair
Ron Hickey
Scott Higgs
Ellen Morris
Jerry Page
Terry Storey
Heather Wiley
Lee Williams

# TABLE OF CONTENTS

## OUR STORY — 04
06 Today - Challenges and Opportunities
07 Plan Purpose
08 Community Engagement

## PLAN ELEMENTS — 11
12 Themes

## COMMUNITY IDENTITY — 13
14 Background
16 Guiding Principles
16 Land Use Building Blocks
16 Tools & Policies

## BUSINESS & JOBS — 17
18 Background
19 Guiding Principles
19 Land Use Building Blocks
19 Tools & Policies

## NEIGHBORHOODS & HOUSING — 21
22 Background
23 Guiding Principles
23 Land Use Building Blocks
23 Tools & Policies

## FACILITIES — 25
26 Background
28 Guiding Principles
28 Land Use Building Blocks
28 Tools & Policies

## LAND USE — 30
30 Background
31 Guiding Principles
34 Land Use Categories
39 Appendix

## PHOTO CREDITS
City of Independence
John Howe
Herbert Webb
Shockey Consulting Services
Drumm Farm
Independence School District

3



# NEIGHBORHOODS & HOUSING

Create vibrant, safe neighborhoods that are walkable and offer diverse uses, services, and housing options for all.

Englewood Arts District Plan

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM



# NEIGHBORHOODS & HOUSING



**Our vision is to create vibrant, safe neighborhoods that are walkable and offer diverse uses, services, and housing options for all.**

Independence has neighborhoods that are unique, diverse, and compete well in the regional housing market. A variety of housing choices that are distinctive and safe offer housing for all interested in living in Independence.

## GOAL

**Increase quality** — achieve livability, choice, access, health and safety through quality neighborhoods.

## MEASURES FOR SUCCESS

The City's Strategic Plan, Independence For All, tracks progress in the area of neighborhoods and housing using the following measures.

Improved housing conditions.    Increase median value of owner-occupied housing units.    Improve housing affordability.

## BACKGROUND

Independence neighborhoods provide a wide variety of housing types and values, including attractive, affordable housing in many forms and locations. The City is not experiencing robust home building activity like some of the other communities in the region. The Home Builders Association of Greater Kansas City reports that 2017 permit activity for single-family and multi-family homes has increased nearly 13% in the Kansas City region compared to 2016. The City of Independence saw an increase of 46 permits during that same period, however it experienced significantly less permit activity than Kansas City, Lee's Summit, Lenexa, Olathe, Overland Park, and Raymore, and fell below the permit activity of Blue Springs, Grain Valley, Shawnee, and Smithville. The median age of homes built in the late 60's in Independence is 50 years old and the median value is $110,400 (US Census, 2010).

Going forward, Independence seeks to recreate and protect existing neighborhoods with a strong sense of community and connectivity that welcome residents of all ages, incomes and cultures. Independence values and encourages the preservation of safe, secure, quiet neighborhoods in every part of the City with well-tended yards and gardens and nearby parks. Walkable, mixed-use neighborhoods are favored with open system

**Independence seeks to recreate and protect existing neighborhoods with a strong sense of community and connectivity that welcome residents of all ages, incomes, and cultures.**

24

pedestrian and bicycle friendly streets that connect neighborhoods with the rest of the town. Most residential areas should be convenient to neighborhood services, as well as public transit. Additionally, the focus should be placed on the quality of neighborhoods, rather than measuring permit activity as the sole method for measuring success.

**Future Trend**

Traditional neighborhoods are mixed use, walkable, and pedestrian friendly. There is currently a trend in planning and zoning to encourage pedestrian friendly access and walkability. A walkable area is generally understood to be a place that emphasizes people over cars by providing comfortable and convenient pedestrian facilities (such as sidewalks, crosswalks and bike paths) within a mix of land uses. Independence will create the mix of uses and walkability that neighborhoods offered in the past. The traditional neighborhoods in Independence have an advantage because they are already designed to be pedestrian friendly. By bringing back amenities to neighborhoods, connecting and improving sidewalks, and introducing complete streets, people won't have to rely on a vehicle for everyday activities.

## GUIDING PRINCIPLES

Provide a diversity of housing options in all neighborhoods.

Improve and maintain housing stock in established neighborhoods.

Maintain and improve the safety of all housing.

Preserve the integrity of existing neighborhoods and the historic nature of older neighborhoods.

Support sustainability initiatives to create more energy efficient development.

Facilitate the development of connected, mixed use neighborhoods where appropriate.

Neighborhoods and housing should be designed to be inclusive of the needs of the wide span of mobility.

## LAND USE BUILDING BLOCKS

 **Connected**

Balance open space and environmental preservation with the community's development needs.

 **Welcoming**

Foster redevelopment opportunities within the City in an effort to revitalize unused or underused property.

 **Distinctive**

Reflect the historic setting of the City in the built environment.

## TOOLS & POLICIES

 **Connected**

Foster increased density in developments that are closer to centers and neighborhood commercial areas.

Encourage locating housing near existing and developing centers of economic activity.

Identify areas within established neighborhoods where infill development would be appropriate.

Encourage projects that attract long-term residents to downtown.

Explore funding options for the acquisition and assemblage of property in potential redevelopment areas.

Promote accessible neighborhoods for pedestrians, bicyclists and motorists.

Provide access to parks, open space and recreational opportunities from neighborhoods.

Promote compact, contiguous development to ensure the efficient use of land and to enhance opportunities for alternatives to commuting by car.

25

 **Welcoming**

Promote housing design and features that allow people to age in place, such as universal design. Consider the adoption of a universal design or visitbility ordinance.

Update codes as necessary to accommodate the use of new technology and construction techniques.

Strive to create a balance of rental and owner-occupied housing in all neighborhoods.

Encourage the improvement or redevelopment of substandard housing.

Support housing rehabilitation programs and reinvest in housing in existing neighborhoods.

Ensure that environmental nuisances are mitigated where residential uses adjoin higher intensity uses.

 **Distinctive**

Develop neighborhood plans that help ensure a balance of housing types, especially in more mature parts of the City.

Concentrate new development in areas contiguous to existing neighborhoods where it is most cost effective to extend infrastructure and services.

Encourage development that conserves land and allows for single-family housing options.

Promote a mix of housing types within each neighborhood, to provide options for households of all types (singles, families, retirees, etc.) and people of all incomes and ages.

Encourage programs to improve home energy efficiency and resilient design features.

Foster low-impact, naturalized storm-water management practices.

**Policy Documents and Plans**

**Englewood Station Arts District Circulation Plan**
www.indep.us/EnglewoodPlan
**Fairmount District Plan**
www.indep.us/FairmountPlan
**Independence Square Revitalization Plan**
www.indep.us/SquarePlan
**Link Independence:**
**www.indep.us/LinkIndepPlan**
**US 24 Highway Corridor Study**
www.indep.us/24HwyPlan
**Community for All Ages**
http://marc.org/Community/KC-Communities-for-All-Ages
**Fair Housing Assessment GKC**
http://www.marc.org/Regional-Planning/Housing/pdf/FHEA_KC_Region_2014_screen_quality.aspx

26



# LAND USE

**Our vision is to promote and maintain quality neighborhoods and a safe, family-friendly community with cultural diversity to make Independence, Missouri a nationally recognized City with a unique sense of history and place.**

## BACKGROUND

The City of Independence adopted its strategic plan, Independence for All, in 2017. The Land Use section will guide the City's future land use decisions in order to ensure implementation of the strategic plan's Building Blocks. While the strategic plan will be updated every year, this plan provides policies intended to guide City staff, elected officials and the community over the next 20 years.

Land Use addresses factors affecting the physical development of a city, including the satisfaction of human needs, the vitality of the local economy,

the protection and enhancement of the natural and built environment and the efficiency of public infrastructure and service provision. Urban design establishes a context for development in response to the community's desired image. While new development is encouraged, short term benefits must be weighed against long term impacts to the community's quality of life. Land use and urban design decisions will always affect the future in significant, and sometimes irreversible, ways. It is incumbent that a land use plan balances the need for growth with the protection of existing community assets.



**NOLAND ROAD GUIDELINES - NOLAND ROAD COMMUNITY IMPROVEMENT DISTRICT**

32



Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

**Guiding Principle**

**Protect and enhance the viability, livability and affordability of the City's residential neighborhoods while integrating multifamily development throughout the community.**



**Townhomes under construction near Independence Square**

*Policies:*

1. Promote inclusive and economically integrated neighborhoods that allow a diverse mix of residents and housing types.

2. Promote a range of housing options throughout the community.

3. Encourage connecting neighborhoods with greenbelts, trails, commercial centers, and public facilities.

4. Encourage preservation of historic and visual character and function of established neighborhoods, while protecting them from incompatible adjacent development.

5. Encourage protection of existing residential areas from encroachment by incompatible development.

6. Support providing neighborhood amenities throughout the community in an equitable manner.

7. Support preservation of the environmental quality of residential areas and buffer from noxious or nuisance impacts.

**Guiding Principle**

**Ensure that opportunities for convenient and concentrated commercial development are provided to support both the local and regional market.**



**Convenient Concentrated Commercial Development – Truman Gateway Vision Plan**

*Policies:*

1. Support protection of the Independence downtown commercial areas and encourage continued reinvestment and redevelopment.

2. Encourage expansion of commercial opportunities in existing commercial corridors or centers where infrastructure can support growth.

3. Promote opportunities for neighborhood commercial centers that assure compatibility with residential property.

4. Support preservation of historic and aesthetic character and function of established commercial districts.

**33**

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

**Guiding Principle**

**Encourage that the physical character and form of the City reflects its historic setting and that the built environment is compatible with the City's natural environment.**



**Convenient Concentrated Commercial Development – Truman Gateway Vision Plan**

*Policies:*

1. Consider defining and enhancing City gateways and focal points to create a sense of place.

2. Promote protection and preservation of the City's historic buildings and urban pattern.

3. Promote quality in the design and construction of new public and private development.

4. Promote retail and service-oriented businesses on first floors to keep streets active, with non-service/office uses on second floor, and residential uses on upper floors in the downtown area.

**Guiding Principle**

**Provide sufficient opportunities for industrial development sites within the community and promote diversification of the City's commercial/industrial base.**

*Policies:*

1. Promote the retention and expansion of existing, and attraction of new, industrial development opportunities in suitable locations.

2. Encourage mitigation of negative impacts to residential areas located near industrial areas through adequate buffering, appropriate lighting and attractively designed sites.

3. Limit the location of locally unwanted land uses (LULU's), such as scrap reprocessing, junk and salvage yards, quarries, recycling industries, and concrete batch plants.

**Guiding Principle**

**Balance open space and environmental preservation with the community's development needs.**

*Policies:*

1. Encourage protecting and preserving existing open space and park land to meet the community's needs.

2. Encourage expansion of urban green spaces in suitable locations to encourage livability and enhance aesthetics.

3. Encourage parks, green space, trails and similar park/open space uses easily accessible to residents at neighborhood level.

4. Encourage incentives for providing common open/green space and landscaping into all new development when possible.

34

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

**Guiding Principle**

**Encourage the concept of mixed-use development to create diverse and self-sufficient neighborhoods.**



**New Town at Harmony Development**

*Policies:*

1. Promote a compatible mix of land uses that create a diversified urban environment that mixes shopping, employment, recreation, and residential opportunities where appropriate.

2. Promote sufficient buffering and protection of incompatible uses from each other.

3. Consider limiting sprawl and aggregate travel time through use of mixed-use developments.

4. Promote incentives to bring mixed-use to the downtown and other commercial areas.

5. Encourage a mixed-use of residential, commercial and retail uses for new developments that does not define boundaries between residential and those commercial/retail uses that provide less intense, basic services for the neighborhood.

6. Encourage design review to address how mixed-use developments are treated and to require quality development so they become more acceptable to developers and business owners and more sensitive to neighborhood concerns and impacts.

**Guiding Principle**

**Foster redevelopment opportunities within the City to revitalize unused or underused property.**



**Redevelopment Vision Along Truman Road – Truman Gateway Plan**

*Policies:*

1. Encourage redevelopment or adaptive reuse of vacant or underutilized buildings and sites.

2. Promote in-fill development, where appropriate, to support more compact urban form and avoid needless and costly sprawl.

3. Promote redevelopment that maximizes existing infrastructure.

4. Strive to eliminate slum and blight.

5. Promote affordable commercial space for small startup, new or growing businesses.

6. Encourage reinvestment in our existing neighborhoods.

7. Adapt retail sector to marketplace trends.

35



## Connect activity centers and neighborhoods with bike facilities/trails - showcasing public art.

**Guiding Principle**

**Provide physical accessibility throughout the City and connect people to places.**

*Policies:*

1. Encourage and facilitate urban accessibility by walking, cycling, public transit and auto.

2. Support new development concepts that, by design enable people to walk to work, school, day care, shopping, and recreation.

3. Facilitate, where possible, enhanced accessibility.

4. Connect activity centers and neighborhoods with bike facilities/trails - showcasing public art.

**Guiding Principle**

**Establish and maintain housing, transportation, communication and utility systems which support and foster quality development.**

*Policies:*

1. Promote principles of good urban design as part of all development.

2. Support enhancement of the aesthetics of new and existing development -- design, landscaping, parking, signage -- with special sensitivity to the historic character and building materials found in the community.

3. Encourage environmentally compatible and sensitive design that fits the development site.

4. Promote energy conservation efforts in building design, materials, and orientation.

5. Promote land conservation practices in density and building patterns to encourage compact urban form.

6. Encourage flexible development that promotes commercial development to meet community design standards.

7. Promote land use controls to fit the various historic development patterns and the character of neighborhoods throughout the City.

8. Strive to create and redevelop buildings which complement the size and style of surrounding buildings.

36

# CHANGES IN LAND USE
## Future land use in 2040 projects more industrial and mixed use development which aligns with the community's vision and goals.



EXISITING LAND USE - % OF TOTAL LAND



2040 FUTURE LAND USE - % OF TOTAL LAND

## LAND USE CATEGORIES
### RESIDENTIAL USES

**Neighborhoods**

The Neighborhood land use category are existing residential areas that will be preserved and enhanced over time, areas that are emerging as neighborhoods, or areas planned to be a neighborhood in the future. Neighborhoods include a mix of single family detached homes, attached homes, townhomes, condominiums, and multi-family. Neighborhood serving commercial developments, parks and civic uses are also common in neighborhoods. The character of existing neighborhoods should be protected when new development is proposed in order to preserve the quality of life for existing residents. Western Independence (west of Noland Road) has the most mature neighborhoods, some going back to 1800's through the first half of the 20th century. There is a range of residential density from small single-family lots of approximately 5,000 square feet to quarter acre lots in newer areas in southwest Independence and parts of central Independence.

Newer developments occurring in the post-World War II era include larger lot development of 4-5 units per acre. Eastern Independence has a combination of established neighborhoods and adequate space for new development. New neighborhoods should offer a range of densities, although there are locations where the density is lower along with medium and high density multi-family developments that blend in with surrounding single-family and Mixed-Use development. All Neighborhood areas include high-density multi-family development, medium density townhome and duplex development as well as pockets of local commercial activity. Neighborhoods are in close proximity to parks, neighborhood commercial developments and centers. Housing types, though different, are designed to relate to each other to create vibrant and cohesive streetscapes. Existing Neighborhoods may not yet have a complete walkable layout of streets that connect throughout the neighborhood and adjacent developments for seamless transitions. It is necessary to identify where there are gaps in sidewalk connections and identify funding sources for their installation over

37

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

time. New neighborhoods should have a walkable layout with streets that connect in a logical manner throughout the neighborhood and to adjacent developments for seamless transitions. The street and sidewalk system should be designed to safely accommodate pedestrian, bicycle, transit and vehicular transportation modes.

It is the intent of this Plan to preserve this mix of home types and density levels currently in place. Infill activity should aim to blend into the character of the existing building types so as to avoid glaring or jarring contrasts between buildings in both style and scale.

### Urban Neighborhoods

The Urban Neighborhood land use category is located in close proximity to downtown Independence Square, the Englewood Business District, the Maywood District and the Fairmount Neighborhood District. They are residential areas anchored by a neighborhood shopping and dining district that are ideal for residents who wish to live within walking distance to employment or entertainment uses in a business district. These neighborhoods mix existing homes with infill housing and include a range of densities that provide for a diverse range of housing types. Urban residences typically have smaller yards or shared open space areas. Buildings are scaled and sited with an emphasis on pedestrians to create a streetscape suited to regular walking and bicycling trips. These neighborhoods use a connected, pedestrian oriented street design that supports transit service.

### Mixed-Use

The Mixed-Use land use category is intended to accommodate a mix of medium-and high-density housing and complementary office, commercial and institutional uses that have, or will have, sufficient public utilities. Established areas in Independence include the Independence Square, Englewood Business District, the Maywood District and Fairmount where the presence of public utilities and a sufficient population base allows the development of pedestrian-oriented, mixed-use development. The Mixed-Use category can be arranged in different patterns including a) vertical mixed-use buildings; b) horizontal mixed-use blocks;

and c) mixed-use walkable neighborhoods. The pattern will depend on the existing and historical development pattern of the area. Mixed-use can also occur in new areas such as the developing 'New Town' in eastern Independence.

## COMMERCIAL USES

### Neighborhood Commercial

The Neighborhood Commercial land use category is intended to provide convenient shopping opportunities for the daily needs of nearby residential areas. The category, designed for small to moderate scale commercial activity is intended to contain urban design elements compatible with adjacent neighborhoods. They serve residential neighborhoods within a roughly one-mile radius, offering shops, restaurants, studios, small offices and other services that residents typically visit an average of one to three times per week. In some cases, the Neighborhood Commercial land use category may include a grocery store or supermarket. The physical layout should aim toward 'node' or 'center' clusters around an intersection of an arterial or collector street, rather than a 'corridor' (strip design), and should be easily accessed by walking, bicycling and by transit. If such access is currently not available, efforts should be made to provide pedestrian and bicycle connections to the commercial area. Building footprints in this category is generally less than 30,000 square feet (grocery store exception) on sites ranging up to 10 acres. Parking is less prominent than pedestrian features. Open space is encouraged where possible and there is an emphasis on enhancing the pedestrian experience.

### Community Commercial

The Community Commercial land use category offers a mix of retail, restaurants, office, personal services and residential uses with a building(s) footprint from 30,000 square feet up to 400,000 square feet, and are intended to serve surrounding neighborhoods within a 1 to 3 mile radius. They are smaller than Regional Commercial centers drawing customers from the local community. They may include office and residential uses, which may be located above ground floor commercial businesses. Such centers are more

likely to include a supermarket along with general merchandise with a wider range of goods than the Neighborhood Commercial category and contain businesses that are needed less frequently. Community Commercial areas often have two or more anchor tenants that could include a discount store, supermarket or large specialty discount store. Community Commercial centers are more auto and transit oriented than Neighborhood Commercial areas. However as redevelopment occurs, pedestrian, bicycle and trail connections to surrounding neighborhoods are important elements to include where possible. Community Commercial centers are developed on sites from 10 to 40 acres.

### Regional Commercial

The Regional Commercial land use category includes major commercial areas with a variety of large format retailers, restaurants, offices and services. They are located along arterial streets and state highways near interstate interchanges and draw local residents as well as users from surrounding communities up to 70 miles away. Regional Commercial areas are often commercial in use, though they may include a mix of employment and residential uses. Anchor tenants often include full-line or junior department stores, discount stores, or other similar mass merchandisers. Independence has one very large regional center, Independence Center, as well as surrounding developments including Independence Commons, Bolger Square, and Hartman Heritage in southeast Independence. While Regional Centers typically have an emphasis on automobile traffic, it is desirable they be designed (either through retrofitting or building new) to provide connections within the area making it easier to access all parts of the area through a variety of transportation modes (pedestrian, bicycle, transit and vehicular). Regional Commercial areas should be greater than 40 acres and feature building foot prints in excess of 400,000 square feet.

## OFFICE

### Office

The Office land use category includes a range of office types including the traditional office building used for the conducting of business where little or no sale of products, manufacturing, or warehousing occur. These buildings include both campus type development as well as single buildings and could include both single and multiple tenants.

The category could also include limited research and development activities, manufacturing or assembly with little or no sale of products. Examples may include medical research spaces, bioscience, technology, or product development testing. Research and Development uses vary widely in terms of what they do, in some cases they are predominantly office with minimal lab or production space, and in others they are more industrial in nature. Settings may range from campus-like business parks to single-use buildings. These uses are similar to those found in the Light Manufacturing land use category and may include one or the other designation depending on the context of surrounding land uses.

## INDUSTRIAL USES

### Business Park

The Business Park land use category includes manufacturing, transportation and wholesale activities, office and research facilities, and limited retail and services. Most activities (except for limited outdoor display) take place within enclosed buildings. This category will apply to industrial parks as proposed in the land use plan. This land use category will have restrictions on outdoor activities and will include buffering from adjacent areas with less intense land uses.

### Industrial

The Industrial land use category includes manufacturing, limited office, research, retail and service activities. This category may encompass a broad range of intensities and activities, including uses with outdoor activities and the potential for external impacts such as odors, noise and vibration during all parts of the day and night. Adequate and often extensive buffering should be provided and maintained from less intense land uses.

**39**

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

At this time, the Industrial land use category is limited to the Lake City Army Ammunition Plant in eastern Independence. It is the intention of this Plan to protect the plant from encroachment of adjacent land uses as the plant has been in operation since World War II. Adjacent land uses should be aware that the by-product of industrial uses will likely not be compatible with other land uses.

## OTHER USES

### Civic/Public

The Civic/Public land use category includes government buildings, land and libraries. They are typically public or semipublic in nature. In addition to their primary use, they provide gathering spaces, recreation spaces and opportunities for residents to interact. When located in neighborhoods or commercial centers, the design and layout of facilities should connect with the surrounding areas by providing pedestrian, bicycle, transit as well as vehicular connections where possible. Smaller facilities should be located within, or adjacent to residential areas with multi-modal access (pedestrians, bicycles, transit and vehicles) is provided.

### Community Attraction and Tourism

The Community Attraction and Tourism land use category complement the public park and recreation system by offering recreation and entertainment facilities that may not otherwise be available. Community attractions include historic sites, the Silverstein Eye Center Events Center, golf courses, indoor and outdoor sports fields, gymnasiums, tourist destinations including the Vaile Mansion, Bingham Waggoner Estate, National Frontier Trails Museum, the Truman Home, the Truman Library and Museum, the Community of Christ campus and other noteworthy tourist destinations. They are typically large in scale, and could be privately owned or sponsored. Some of the sites within this category may have historical significance and enjoy a national reputation in that they attract visitors from the region and beyond.

### Parks

The Parks land use category includes both active and passive parks, trails and open space. For purposes of this plan, the term 'Open Space' will be used throughout the document as the name of this land use category. Included are public parks, outdoor recreation facilities, state operated nature preserves, such as George Owens Nature Park, County park land such as the Little Blue Trace Trail, natural resource protection areas and other privately owned open space throughout the City.

Schools, churches and civic institutions may incorporate open space into their developments, however this land use plan will defer to the primary land use when depicted on the land use map.

### Agriculture

The Agricultural land use category aims to retain agricultural character and support farmers who wish to maintain and expand agricultural activities as the primary use. Typical agricultural uses are row crops, horticulture, orchards, cattle grazing, poultry and wooded areas. Residential use should be limited to supporting agricultural purposes, such as subdividing one lot for a family member who is participating in the farming enterprise. Minimum lot size is ten acres.

In Independence, the Agricultural land use is located in far northeast part of the City and is north of the Army Ammunition Plant, a Heavy Industrial land use that has been in place since World War II. The subdivision of land within this land use category should be done with full knowledge that the Heavy Industrial land use is existing, and is entitled to environmental nuisances including noise, odors and vibrations at all times of the day and night.

40

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

# AMY CORN

*Licensed Realtor in Mo & KS*

Bill McCoy Real Estate Co. LLC
1 Dakota Circle, Lake Winnebago MO 64034
C: 816-804-0282
E: amycorn@prodigy.net

**To Whom It Concerns:**

In regards: 3206 N Spring St, Independence MO

Let me begin by introducing myself. My name is Amy Corn, I have been a licensed realtor in MO & KS, specializing in Jackson County for 17+ years. I have conducted over 1,000 successful real estate transactions, I am an expert in my field and have been called to testify as an expert on multiple occassions.

Per my general review, a 22 unit retirement village will most likely increase area home values. A quality built, new construction retirement village would be a neighborhood improvement.

Not only is this an ideal location but there is a vital need for many aging Independence residents to have access to such properties that are essentially maintenance free & professionally constructed/maintained.

Sincerely,

**Amy Corn**
*Realtor*

EXHIBIT

6

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

**DECLARATION OF COVENANTS
OF
KENTUCKY PLACE
(rough draft)**

THIS DECLARATION is made on this ___ day of _____ 2020, by Isosceles Properties, L.L.C., a Missouri Limited Liability Company, GRANTOR, consisting of Ryan Rader, Managing member (herein "Isosceles"), whose address is 4303 Merriam Drive, Overland Park, Kansas 66203.

WITNESSETH:

WHEREAS, Isosceles has developed a project known as "Kentucky Place" as a two unit house project for residential purposes and it is now desired to continue the development of such land for such purposes and to create and maintain a quality atmosphere, possessing features of more than ordinary value to a residential area consisting of two unit houses:

NOW, THEREFORE, in order to assist the developer and its grantees in order to provide the means necessary to maintain common areas and enhance property values and create a proper two unit house residential atmosphere about the aforesaid area described as the real property mentioned in Section 1 hereof, Isosceles does hereby subject the real property hereinafter described in Exhibit "A" to the terms and provisions as set forth and contained in this Declaration.

<center>ARTICLE 1
GENERAL</center>

<center>**Section 1. DEFINITIONS**</center>

The following words, when used in this Declaration, unless the context shall prohibit, shall have the following meaning:

a.      Isosceles shall mean and refer to the Missouri Limited Liability Company, the owner of the above-captioned property.

b.      The "Property" shall mean Lot 1, Solid Rock Addition, a subdivision in Independence, Jackson County, Missouri, legally described in Section 2 hereof, and any and all improvements thereon and additional thereto, as are made subject to this Declaration.

c.      "Declarant" shall mean and refer to Isosceles, a Missouri Limited Liability Company, its successors and assigns, and shall include any person or entity to



EXHIBIT
7

which Declarant may assign its rights, privileges, duties and obligations hereunder, which rights, privileges, duties and obligations are and shall be assignable.

d.      "Common Property" shall mean and refer to all of those areas of land within the property "other than any other unit", including any improvements thereon or therein, used for or intended to be used for the benefit of the remaining property or any portion thereof, whether owned by the Declarant or approved as such. By the way of illustration and not as a limitation thereof, Common Property shall consist of those areas identified as such on any recorded plat or its equivalent subject to this Declaration, including those areas identified as a special use whether such use be for private drive, street, walk or access, private utility easement, service, storm drainage or sewer, open space, parking space, buffer or berm, and any other such identifiable use.

e.      "Association" shall be defined as KENTUCKY PLACE OWNERS ASSOCIATION or its successors and assigns, a corporation under the laws of the State of Missouri for the purposes of the enforcement of these covenants, maintenance of common areas and such other purposes as may be laid out in the Articles and By-Laws of said corporation.

f.      "Unit" shall mean and refer to each individual and separately platted portions of the "Property" upon which a two unit house or structure may be located. The unit shall be an entire building or portion thereof and the membership and voting rights of said unit, as defined in Article II, Section 1, shall be determined by its square footage as described in Exhibit "B" attached hereto. Separate minor plats may be filed at later dates describing additional units within the area of the "Property".

g.      "Board" as used herein shall refer to the three members of the Board of Directors.

h.      "Board of Directors" shall mean and refer to the Board of Directors of the Kentucky Place Owners Association, a not-for-profit corporation.

## Section 2. PROPERTY SUBJECT TO DECLARATION

The real property covered by this Declaration is described in Exhibit "A" attached hereto plus such additional property, if any, which may hereafter from time to time be subjected to this Declaration pursuant to Section 3 of this Article. The property shall be owned, held, leased, sold and/or conveyed by the Declarant, and any subsequent owner of all or any part thereof, subject to this Declaration and the covenants, restrictions, reservations, development standards and assessments set further herein.

## Section 3. ANNEXATION—ADDITIONAL PROPERTY

Declarant may, from time to time, subject to this Declaration, annex such additional land as is now or hereafter approved for addition by Declarant, provided further that the land to be added shall at that time be bound by all terms of this Declaration and any future amendments and modifications thereof. The annexation of land to this Declaration shall be accomplished by and take effect upon the recording of an appropriate instrument in the office of the Recorder of Deeds of Jackson County, Missouri.

## ARTICLE II
## OWNERS ASSOCIATION

### Section 1. MEMBERSHIP AND VOTING RIGHTS

The owners of all the land described in Exhibit "A", together with the owners of any other land that may from time to time be made subject to all of the terms and provisions of this Declaration in the manner hereinabove provided for, shall automatically be the members of an association, which is hereby created and established to be known as Kentucky Place Owners Association (the "Association"). The Association, not later than two years from the date hereof, shall be incorporated by Declarant under the laws of the State of Missouri as corporation not-for-profit. Membership in the Association shall be limited to the Owners of land and units within the boundaries of the Property as it exists from time to time. Each owner shall be entitled to one vote.

For a period of two (2) years next following the date hereof, Declarant shall assume the rights and duties of the Association with full power to act in its place. Declarant may, however, form the Association corporation at anytime prior to the expiration of said two (2) year period if Declarant, at its sole option, decides to do so and thereafter such rights and duties shall be exercised by such corporation.

The Association, after it becomes a not-for-profit corporation, shall have all of the powers held by Declarant prior to the incorporation of the Association. Said powers of the Declarant are as hereinafter set forth in this Declaration.

### Section 2. NON-ASSIGNABILITY OF VOTING RIGHTS

Voting rights are appurtenant to and may not be separated from the ownership of any lot or unit which is subject to assessment by this Declaration and the Association. Voting rights may not be assigned to a tenant and may only be assigned by proper form or proxy to a designated representative of the corporation, limited liability company, or partnership qualifying for membership as defined in Article II, Section 1, above.

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

**Section 3. POWERS AND DUTIES OF THE ASSOCIATION**

The Association shall have the following powers and duties which it may exercise and perform whenever, in its discretion, it may deem them necessary or desirable, to wit:

a. To enforce, either in its own name or in the name of any owner within the district, any or all building restrictions which have been herein, or may hereafter be imposed upon any of the land in such district, either in the form as originally placed thereon, or a modified subsequently thereto; provided, however, that this right of enforcement shall not serve to prevent such changes, releases or modifications of restrictions or reservations being made by the parties having the right to make such changes, released or modifications as are permissible in the deed, declarations or contracts in which such restrictions and reservations are set forth, nor shall it serve to prevent the assignment of those rights by the proper parties, wherever and whenever such rights of the assignment exist. The expenses and cost of any enforcement proceedings shall be paid out of the general fund of the Association as herein provided for. Nothing herein contained shall be deemed or construed to prevent any owner having the contractual right to do so from enforcing in his own name any such restrictions.

b. To manage and control, as Trustee for its members, all walkways, _____, _____, provided that such management and control of said places and improvements shall at times be subject to proper authority exercised by any city, township, county, and state, and/or any of them in which said places and improvements are Located.

c. To provide for the collection and disposal of rubbish and other waste, when adequate services of that type are not available from any public source.

d. To care for, water, spray, trim, protect and replant trees, grass and shrubbery, and re-sow grass and replace sod and other landscaping features in any area or portion of Kentucky Place.

e. To mow and care for, maintain and remove all rubbish from land within the "Property" and to do those things necessary or desirable in the judgment of the officers of the Association to keep all land in the district neat in appearance and in good order.

f. To provide for the plowing and removal of snow from walkways, driveways and parking areas, when such services are not available from any public source.

g. To provide for the maintenance and repair of the detention area and common area and _____.

h.     To provide for the cleaning of driveways, gutters, catch basins, walkways, and for the repair and maintenance of storm sewers and appurtenant drainage facilities when such services are not available from any public source.

i.     To acquire and own the title to such real estate as may be offered to it for purchase or by gift and as may be necessary or convenient to carry out the purposes of the Association and to pay taxes on such real estate as may be owned by it, and to pay such taxes as may be assessed against land in public or semi-public places within the district.

j.     To exercise control over such easements as it may acquire from time to time.

k.     To levy and collect the assessments which are provided for in this declaration.

The Association shall at all times have the right, in its discretion, to go upon the private property of any of the owners of any portion of the real estate hereinabove described to do the work herein provided for in this Section 3 without the request of the owner thereof so to do and with or without the consent of said owner. An easement is hereby granted to the Association for these purposes.

Special assessments may be imposed by the Board of Directors upon any lot or land upon which units are located for the purpose of maintaining the exterior appearance thereof. If the owner shall have failed or refused to do such maintenance, including but not limited to, painting, repairing, replacing and caring for roofs, gutters, downspouts, exterior building surfaces, and other exterior improvements necessary to keep the owner's property from deteriorating or becoming unsightly, then for the purpose of solely performing exterior maintenance authorized by this paragraph, the Association or its authorized agent shall have the right, if reasonable notice is given to the owner, to enter upon the lot at any reasonable hour on any day, except Sunday.

In addition to the foregoing, the Association may levy any special assessment against lots for the purpose of defraying, in whole or in part, the cost of any construction, reconstruction, repair or replacement of a capital improvement upon the Common Area, including fixtures and personal property relating thereto, providing that any such assessments have the assent of two-thirds (2/3) of the members voting in person or by proxy at a regular or special meeting.

### Section 4. COMMON PROPERTIES

a.  Easements of Enjoyment

Subject to the provisions of Paragraph (c) hereof, every member of the Association shall have a reciprocal easement of enjoyment in and to the Common Properties.

b.  Title to the Common Properties

Declarant shall convey ownership of the Common Properties then owned by Declarant to the Association within two (2) years after its creation or within two (2) years after such property is designated for use as common property in accordance with Article I, Section 1(d), and the Association shall be responsible for their operation and maintenance.

c.  Extent of Easements

The Association shall have the right to suspend the easements of enjoyment of any member, voting privileges, and right to maintenance of any member of the Association, to the extent any valid assessment levied under Article V hereof remains unpaid by such member.

<div align="center">

ARTICLE III
BOARD OF DIRECTORS

### Section 1. BOARD
</div>

The Association shall have a Board of Directors ("Board") which shall consist of three (3) members who shall be natural persons.

<div align="center">

### Section 2. DESIGNATION OR ELECTION OF BOARD
</div>

The members of the Board shall be appointed, elected and/or removed as follows:

a.  Until Fort-five percent (45%) of the Property is sold by Declarant to other persons or legal entities, or until October 1, 2040, Declarant shall have the exclusive power and right to appoint and remove the members of the Board of Directors and to fill vacancies thereon.

b.  The initial Board shall consist of three (3) representatives who may be members of the Declarant or designated by the Declarant. Thereafter, subsequent members may be members of the Association or their assigns.

b.  After forty-five percent (45%) of the Property is sold by Declarant to other persons or legal entities, the persons or legal entities who own parcels of land in

the Property shall by majority vote have the exclusive power and right to elect for two (2) year terms and remove the members of the Board and to fill vacancies thereon. Owners may vote in person or by proxy at a meeting duly called for such purpose and place, written notice of which shall be given to all owners at least thirty (30) days in advance and shall set forth the purpose and place of such meeting.

## Section 3. FUNCTION OF BOARD OF DIRECTORS

No improvements, as that term is hereinafter defined, shall be erected, constructed, placed or altered on any portion of the Property until plans and specifications in such form and detail as the Board of Directors may deem necessary shall have been submitted to and approved in writing by such Board. The decision of the Board shall be final, conclusive and binding upon the applicant and upon all lands heretofore or hereafter subject to those restrictions.

## Section 4. CONTENT OF PLANS AND SPECIFICATIONS

Prior to the construction of any improvements or modifications, one set of plans and specifications shall be submitted to the Board of Directors or such other address as may be specified by the Board and shall include the following:

a.    Exterior elevations.

b.    Landscaping plan, including walkways, fences and walls elevation changes, watering systems, vegetation and ground cover.

c.    Fire protection system, if any.

d.    Proposed land usage and such other information as may be required by the then applicable zoning code of the City of Independence.

## Section 5. DEFINITION OF "IMPROVEMENT"

Improvement shall mean and include all buildings and roofed structures, parking areas, loading area, fences, walls, hedges, mass plantings, poles, driveways, ponds, recreational amenities, signs, exterior illumination, changes in any exterior color or shape and any new exterior construction or exterior improvement. It does not include garden shrub or tree replacements or any other replacement or repair of any magnitude which ordinarily would be expensed in accounting practice and which does not change exterior colors or exterior appearances.

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

### Section 6. APPROVAL CRITERIA FOR THE BOARD

Approval of plans and specifications shall be based, among other things, on general adequacy of site dimensions, structural design, conformity and harmony of exterior design and of location with neighboring structures and sites, relation on finished grades and elevations to neighboring sites, compliance with applicable governmental requirements and conformity to both the specific and general intent of the restrictions and covenants set forth herein.

### Section 7. LIMITATION OF LIABILITY

Declarant shall not be liable for damages to anyone submitting plans to it and/or the Board for approval, or to any Owner, Tenant, prospective Tenant, buyer, prospective buyer, mortgagee, prospective mortgagee or any land affected by this Declaration, or any other person or entity, who is or may have any interest or prospective interest in any land affected by this Declaration, by reason of mistake in judgment, negligence or nonfeasance or malfeasance arising out of or in connection with the approval or disapproval or failure to approve any such plans and specifications. Nothing in this paragraph shall be deemed to limit the liability of Declarant for any error or omission in any certificate furnished by Declarant pursuant to Section 3 of Article V hereof.

### Section 8. LIMITATION OF BOARD ACTIONS

If the Board fails to approve or disapprove the plans or specifications or to reject them as being inadequate within thirty (30) days after submittal thereof, it shall be conclusively presumed that the Board has approved the plans and specifications submitted.

### ARTICLE IV
### DEVELOPMENT STANDARDS

Any offensive activity shall be prohibited. No exterior lighting shall be directed outside the boundaries of the lot and parcel or otherwise authorized by the Association.

### Section 1. USES

a.   Permitted Uses

Two unit houses.

b.   Prohibited Uses

The following uses of parcels of land in the Property are not permitted:

1) No sign advertising the sale or rental of a lot or land, whether improved or not, shall be erected, except those which have been furnished or approved by the developer, not more than five (5) square feet in area, advertising space for sale or rental by the owner of the commercial unit. No other signs may be placed or directed on the property without written approval of the Board of Directors.

2) Temporary structures are not permitted.

3) Further subdividing other than initial subdividing by the Declarant of parcels of land or units without prior written approval of the Declarant or its assigns is prohibited.

c. Permissible Uses

Subject to the limitations set forth in subsection (a) above, all lawful types of land uses consistent with the zoning ordinances and special use permit requirements of the City of Independence will be considered subject to acceptance and approval in writing by the Board.

**Section 2. SIGNAGE**

a. N/A.

**Section 3. MAINTENANCE**

a. Duty of Maintenance

Owners of any unit in the Property shall jointly and severally have the duty and responsibility, at their sole cost and expense, to keep their unit in a well-maintained, safe, clean and attractive condition at all times. Declarant or the Association shall maintain and charge existing unit Owners pro rata for such services based upon the square foot of each unit Owner's unit divided by the total square footage of the buildings. Such maintenance includes, but is not limited to, the following:

1) Prompt removal of all litter, trash, refuse and waste.

2) Lawn mowing.

3) Tree and shrub pruning.

4) Watering by means of a lawn sprinkler system.

5) Keeping exterior lighting and mechanical facilities in working order.

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

6)      Keeping lawn and green areas alive.

7)      Keeping parking areas, driveways and roads in good repair.

8)      Complying with all governmental, health and police requirements.

b.      Maintenance Enforcement

If, in the opinion of Declarant, the Board, and/or the Association as appropriate, the Owner or occupant of any unit in the Property shall fail to keep the Unit maintained in compliance with this Declaration, the owner or occupant shall be notified of the deficiency with particularity. If within ten (10) days from such notice, remedial activities to correct the deficiency have not been begun to restore the parcel to a safe, clean, attractive and lawful condition, then Declarant, the Board, and/or the Association shall have the right to perform such necessary remedial activities. The costs shall be assessed against the Owner, and if the assessment is not paid within thirty (30) days after written notice, said assessment shall constitute a lien on that Unit and any such lien shall be enforced in the manner hereinafter provided.

## Section 4. RECIPROCAL EASEMENT

a.      Party Walls:

Each wall which is built as a part of the original construction of units upon the property and placed on the dividing line between two or more units shall constitute a party wall, and to the extent now inconsistent with the provisions of this Declaration, the general rules of law regarding party walls and liability for property damage due to negligence and willful acts or omissions shall apply thereto.

1)      The reasonable repair and maintenance of a party wall not covered by insurance shall be shared by unit owners who make use of the wall.

2)      Notwithstanding any other provision of this Declaration, any unit owner who by his, her or its negligence or willful act causes the party wall to be exposed to the elements shall bear the entire cost of furnishing the necessary protection against such elements.

3)      The right of any unit owner to contribution from any other unit owner with respect to the obligations relating to party walls shall be considered an appurtenant right and pass to any and all successors in interest to the title of such unit.

4) The boundary line between units which share a party wall is and shall be deemed to be the centerline of the wall regardless of the actual location of the platted boundary line.

b. Reciprocal Easement

On any property subject to this Declaration that is divided, whether by plat or otherwise, into lots, blocks, parcels, tracts, etc., or portions thereof, and whose common boundary line is paved for parking and/or driveway, there is hereby created a reciprocal easement over such driveway and parking areas. All owners and invitees shall park or allow their invitees to park their motor vehicles on the designated parking areas shown on the Preliminary Plat and Site Plan recorded in conjunction with this Declaration.

<div align="center">

ARTICLE V
METHOD OF PROVIDING GENERAL FUNDS

**Section 1. ASSESSMENTS**

</div>

For the purpose of providing a general fund to enable the Association to exercise the powers and maintain the improvements and render the services herein provided, all real estate lying within the boundaries of the district shall be subject to an annual assessment which will be levied by the Association annually in advance against the respective owners of the said assessable land subject thereto. Said assessable land shall be deemed to be all of the privately owned real estate in KENTUCKY PLACE, together with such other privately owned real estate as may, from time to time, be added to the said district as herein provided. The Association may, from year to year, fix and determine the total amount required in this general fund, and will levy and collect an annual assessment based upon the number of square feet of property, as defined below, of any one of the respective owners within the Property as now or hereafter established or pursuant to a fixed annual amount per unit (to be determined by Declarant/Board). The assessment of the privately owned property by the Association shall be reasonable, keeping in mind the needs of all of the owners of property within the Property, and concomitantly keeping in mind the obligations of the Association as herein set out. The assessments shall be based on the square footage of each unit Owner's unit divided by total square footage of the buildings.

When the Association is incorporated, but not later than _____ the initial assessment shall be _____ ($_____) per square feet to be billed annually. Notice of any meeting called for the purpose of taking any action authorized for such an increase shall be sent no less than thirty (30) days nor more than sixty (60) days in advance of the meeting. At such meeting the present fifty percent (50%) of the membership shall constitute a quorum. If the required quorum is not present, another meeting may be called with the same notice requirement and the required quorum of the subject meeting shall be one-half (½) of the required quorum of the preceding meeting.

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM

The Association shall, upon demand, furnish a certificate in writing signed by an officer of the Association setting forth the assessments of specified lots which have personally been paid. A reasonable charge may be made by the Board for the issuance of these certificates. Such certificates shall be conclusive evidence of the payment of any assessment to have been paid.

### Section 2. LIEN AND ENFORCEMENT

The Owner of each parcel of land shall within thirty (30) days after the date upon which a notice of assessments pursuant to any provision of this Declaration is delivered to Owner or is mailed to Owner at the last address registered with the Association, or if none, at the address of the improvements, if occupied, remit the amount of such assessment to the Association. Any assessment not paid within the aforesaid 30-day period from the date of such notice shall bear interest after said 30-day period at the highest rate allowed by law until paid. All assessments not paid as set forth herein, plus accrued interest shall constitute a lien in favor of the Association on the parcel superior and prior to all other liens and encumbrances, except that each and every such lien shall (1) attach on the date of the recording of the Notice of Assessment (hereinafter defined) as hereinafter provided and (2) be subordinate, junior and inferior to liens for general taxes and special assessments, the lien of any mortgage of record and the tenancy rights of Tenants. If any such assessment is not fully paid within thirty (30) days after the date such notice was mailed as hereinabove provided, the Association to evidence such lien of record, may prepare a written notice (the Notice of Assessment") setting forth the amount of such unpaid assessment, the date of such assessment, the name of the Owner or the apparent Owner and legal description of such parcel, and record such Notice of Assessment in the office of the Recorder of Deeds for Jackson County, Missouri.

Any assessments which are not paid when due shall become delinquent and become a lien upon the property. If the assessment is not paid within thirty (30) days after the due date, it shall bear interest from the date of delinquency at the rate of no less than one percent (1%) per month applied to the delinquent amount including prior interest and the Association may bring an action against the Owner personally, who is obligated to pay the same or close said lien against the property and the interest, cost, and reasonable attorneys fees for any such action shall be added to the cost of the amount of the assessment. A minimum fee of One Hundred Fifty Dollars ($150) shall be levied by the Association if the lien is filed. No Owner may waive or otherwise escape liability from the assessments provided for herein by non-use of the Common Properties or abandonment of his lot or parcel. The Board of Directors may post, publish or mail a list of delinquent members, setting forth their names, address and the amount of delinquency and shall not be required to provide any advance notice of such action. The lien of the assessments provided for herein shall be subordinate to the lien of the first mortgage. Sale or transfer of any lot or parcel shall not affect the assessment lien. However, the sale or transfer of any lot or parcel pursuant to first mortgage foreclosure or any proceeding in lieu of foreclosure thereof, shall not extinguish the lien of such assessments as to the payments thereof which become due prior to such sale or transfer. No sale or transfer

shall relieve such lot or parcel from liability for any assessments thereafter becoming due or from the lien thereof.

Upon written demand from any Unit Owner, Declarant or the Association, as applicable, shall provide to such Unit Owner within ten (10) days of such request, an itemized accounting of all assessments collected and all operating expenses paid by such assessments. To the extent such actual assessments exceed actual spending expenses at years end, the surplus shall be carried over and shall be used to fund maintenance and operating reserved fund for use at the discretion of the Board of Directors.

### Section 3. EXEMPT PROPERTY

The following property subject to this Declaration shall be exempt from assessment created herein:

a)      All properties dedicated to and accepted by public and local public authorities.

b)      The Common Area Properties.

### ARTICLE VI
### EASEMENTS AND UTILITIES

### Section 1. PROVISIONS FOR PARKING AND UTILITIES

a.      Declarant and its members shall have no obligation with respect to bearing the cost of maintenance, repair and operation of the easement area, the same being funded by the annual maintenance assessments being provided by the members of the not-for-profit corporation.

### Section 2. RESERVATION OF PERPETUAL EASEMENTS AND EXISTING UTILITIES

Declarant states and the members acknowledge that certain utility conduits are located on or shall be located under the subject Property and that such conduits serve other portions of the members' buildings, which are owned by Declaration, the Association, or members. Declarant, for itself as well as others holding ownership interest in Kentucky Place, hereby reserves perpetual easement ten (10') or fifteen (15) feet in width as designated by the City of Independence for all underground lines or conduits with the line or conduit bring the centerline thereof or the utility line created or to be created on the subject plat across the subject Property for the purpose of operating, maintaining, inspecting, protecting, repairing, replacing and/or removal of the following utility lines or conduits:

a.   Underground telephone trunk lines easements, as legally described in the Plat and Site Plan attached hereto and incorporated herein by reference.

b.   Underground storm sewer easements, as legally described on attached hereto and incorporated herein by reference.

c.   Underground sanitary sewer easement, as legally described on attached hereto and incorporated herein by reference. Declarant and the Association shall have the right to relocate the underground sanitary sewer to the locations if required by rocks, disruption of service or other act, and said reconstruction shall be performed in a good workmanlike manner.

d.   Underground electrical conduit easement, as legally described on attached hereto and incorporated herein by reference.

e.   Underground water line easement, as legally described in attached hereto and incorporated herein by reference.

f.   Declarant or the Association or its assigns shall have reasonable temporary access across the subject property for the purpose of operating and maintaining, inspecting, protecting, replacing and removing the above lines and utility conduits. The Association agrees it will not unnecessarily interfere with members' business operations and shall use its best efforts to work during off-peak hours or in the cases of emergency.

<div align="center">ARTICLE VII<br>MISCELLANEOUS PROVISIONS</div>

<div align="center">**Section 1. DURATION**</div>

This Declaration, every provision hereof and every covenant, condition restriction and reservation contained herein shall continue in full force and effect for a period of twenty-five (25) years from the date hereof, subject to earlier termination as hereinafter provided, and shall thereafter be renewed automatically for successive twenty-five (25) year periods unless and until terminated as hereinafter provided.

<div align="center">**Section 2. MANAGEMENT**</div>

The Declarant in the interests of maintaining the external portions of the buildings and grounds hereby reserves the right to designate a management agent for the property. The management company shall serve the association in securing services for the external portions of the buildings and common properties, which shall include but not be limited to lawn and landscaping services, snow removal, trash service, external parking lot lighting repair and replacement, parking lot maintenance, and external building repair and or as stated in Article IV, Section 4. They may also calculate and

collect the yearly assessments for these services which shall be reviewed by the association which shall include the funds for the aforementioned services and taxes for the common properties.

## Section 3. AMENDMENT AND TERMINATION

This Declaration or any provision hereof, or any covenant, condition, restriction, or reservation in whole or in part, as to the whole of said Property or any portion thereof, may be terminated, extended, modified or amended by a majority of the eligible votes of the Owners of the Property then subject to these restrictions provided, however, that during the initial twenty-five (25) year term of this Declaration, no such termination, extension, modification or amendment shall be effective without the written approval of Declarant. Such termination, extension, modification or amendment shall be immediately and only effective upon recording a proper instrument in writing, executed and acknowledged by such Owners (and by Declarant as required herein) in the office of the Recorder of Deeds, Jackson County, Missouri; further provided, however, despite anything to the contrary in the preceding portions of this Section, that during the first two (2) years of the initial twenty-five (25) year term of this Declaration, Declarant shall have the unqualified and unilateral right to modify or amend this Declaration and any such modification or amendment shall be effective upon recording a proper instrument in writing, executed and acknowledged by Declarant, in the office of the Recorder of Deeds of Jackson County, Missouri.

## Section 4. ENFORCEMENT

a.      These conditions, covenants, restrictions and reservations may be enforced as provided hereinafter by Declarant acting for itself and as attorney-in-fact for each Owner. Each Owner by acquiring an interest in KENTUCKY PLACE does irrevocably appoint the Declarant as his attorney-in-fact for such purposes; provided, however, that if an owner notifies Declarant of a claimed violation of these conditions, covenants, restrictions and reservations and Declarant fails or refused to act within thirty (30) days after receipt of such notification, then, and in that event only, such Owner at its own cost and expense, may enforce the conditions, covenants, restrictions and reservations herein contained. Violation of any condition, covenant, restriction or reservation herein contained shall give to the Declarant (or if Declarant fails or refuses to act as hereinabove provided, any Owner of a parcel of land), at its option, the right to enter upon the portion of the Property wherein said violation or breach exists and to summarily abate and remove at the expense of the Owner any structure, thing or condition that may be or exists thereon contrary to the intent and meaning of the provisions hereof. Declarant, or if Declarant fails or refuses to act as hereinabove provided, any Owner may at its expense prosecute in a proceeding at law or in equity against the person or persons who have violated or are attempting to violate any of these conditions, covenants, restrictions and reservations to enjoin or prevent them from doing so, to cause said violation to be remedied or to recover damages for said

violation. If Declarant (or any Owner as aforesaid) prosecutes any action hereunder in law or equity against a particular Owner, in which Declarant or such Owner obtains a final court order which in whole or in part grants the relief sought, Declarant (or any Owner as aforesaid) shall be reimbursed by that Owner for all costs and expenses, including attorneys fee (to the extent not provided by law), incurred by Declarant (or any Owner as aforesaid) under this paragraph for which an Owner is obligated to reimburse Declarant (or any Owner as aforesaid) shall constitute and be an assessment against the parcel of land of such Owner and be a lien thereon, which lien shall attach thereto, have the priority and be enforceable by Declarant (or any Owner as aforesaid), all as set forth in Article V, Section 2 hereof; it being understood that any Owner, so incurring costs and expenses as aforesaid, shall have the same rights under Article V. Section 2 hereof as Declarant in respect to the enforcement of such a lien.

b.      The failure or refusal of Declarant (or any Owner as aforesaid) to enforce any of the conditions, covenants, restrictions or reservations herein contained shall in no event be deemed to be a waiver of the right to do so for subsequent violations or of the right to enforce any other conditions, covenants, restrictions or reservations. Declarant shall incur no liability to any Owner or to any Tenant or to anyone else, should Owner fail or refuse to enforce or continue to enforce any condition, covenant, restriction or reservation contained herein.

c.      All remedies provided herein or at law or in equity shall be cumulative and not exclusive.

IN WITNESS WHEREOF, the undersigned, being the Declarant herein, have hereunto set their hands and seal this _____ day of _____, 2020.

>                        ISOSCELES PROPERTIES, L.L.C.
>                        a Missouri Limited Liability Company


>                        By:_____
>                                Ryan Rader, Managing member

STATE OF MISSOURI    )
                       )ss:
COUNTY OF JACKSON    )

On this _____ day of _____, 2020, before me, a notary public within and for said county and state, appeared Ryan Rader to me personally known, who being by me duly sworn, did say that he is the managing member in the Missouri Limited Liability Company known as ISOSCELES PROPERTIES, LLC, and that said instrument was signed and sealed on behalf of said limited liability company, and said, **Ryan Rader** acknowledged said instrument to be the free act and deed of said limited liability company.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal at my office in _____, Missouri, the day and year last above written.


_____
Notary Public

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM



Caton
Architectural
Design LLC

August 14, 2020

City of Independence
Community Development Department
111 E. Maple
Independence, Missouri 64050

**Attn: Mr. Brian Harker – Senior Planner**

**Subject:** 3206 Spring Street – Parcel ID #15-520-09-39-00-0-00-000

Below are our responses to the comments we received from the city on August 4th, 2020. City comments are blue in color and our responses are in black:

## Comments, Corrections and Questions

1.  Provide sidewalks along all three rights-of-way;

    A sidewalk has been added to Colonel Drive right-of-way

2.  As discussed on May 28th, please provide for amenities not typical of other developments (i.e. walking paths, playground, gazebo, shelter house, grills, picnic tables, benches, common space, common parking, etc.);

    We plan to incorporate a gazebo into Tract 1 (common space) along with the detention requirements when discussed with city engineering.

3.  As discussed on May 28th, please include additional design features not typical in other zonings (i.e. different and unique architectural facades or alternative site layouts);

    We plan to have a few different color palettes and mix some of the front elevation material patterns (shake shingle siding, scallop shingle siding, and laps siding for example)

4.  Locate all new "street" trees on the properties and not in the right-of-way. Further, provide a tree in the rear yard area of every lot. On the landscaping plan, show a 15-foot wide High Intensity Buffer Zone, per Code, abutting the R-6 zoned properties to the north;

    Street trees and rear yard trees have been added. The property to the north is zone R-30 which does not require a Buffer Zone.



**EXHIBIT**

8

5. Be aware that storm water flooding has been reported in this area. During the engineering plan review, you will be required to meet or exceed any and all City storm water mitigation requirements to prevent future flooding issues;

   Understood

6. Will there be monument entries for this development?  Where will they be placed?;

   No

7. Will this development be built in phases or all at one time?  If in phases, indicate the sequence;

   Unknown at this time.  This will be developed as the approval processes move forward with the city.

8. Anticipated sanitary sewer loads may exceed existing sanitary sewer main capacity. Please anticipate an analysis of the existing sewer capacity along with the appropriate infrastructure improvements during engineering plan review;

   We have already reviewed this with the Public Works department and have been told there is plenty of capacity for our proposed development of the site.

9. Indicate standard 5-foot wide general utility easements along all three rights-of-way.  Further, provide any additional easements required by IPL and the Water Department;

   This has been added to the preliminary plat

10. Label Lot 1, Tract 1 instead.  Change Lots 2 through 12 to Lots 1 through 11;

    This has been changed

11. Note:  The addresses (based on the **revised** tract and lot numbers from above):
    Pleasant Street (Lots 1 through 5): 3201 A&B, 3203 A&B, 3205 A&B, 3207 A&B and 3209 A&B
    Spring Street (Tract A and Lots 11 through 6) 3200 and 3202 A&B, 3204 A&B, 3206 A&B, 3208 A&B, 3300 A&B and 3302 A&B

    This has been added

Kansas City, Missouri                                                                caton4design@gmail.com

12. By August 7, 2020, send out official City notifications of the virtual public hearing for those living within 185-feet of the PUD for August 25th Planning Commission meeting (See attached Property Owner Notification Letter).
Your Case number is 20-810-02.

This has been done

13. As discussed on May 28th, please provide information related to the neighborhood meeting staff requested on this proposed project; including but not limited to notice of the meeting, sign-in sheet of parties present, and the agenda covered.

We have a zoom meeting scheduled for August 19th at 5:30PM

If there are any questions about any of the submitted drawings or the description of the project above, don't hesitate to give us a call.

Sincerely,

Shawn E. Caton, AIA
Architect
Missouri License #A-2001018718
Expires: December 31, 2021

Signed by: Shawn E, Caton, AIA
Date: 2020.08.14

Kansas City, Missouri

caton4design@gmail.com

Electronically Filed - Jackson - Independence - December 16, 2020 - 08:55 PM